[No. S064769. Apr. 23, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS ANTHONY HAWTHORNE, Defendant and Appellant.

## COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointments by the Supreme Court, Arcelia Hurtado and Katherine Froyen, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—A jury convicted defendant Carlos Anthony Hawthorne of the first degree murder of Vanessa Sells (Pen. Code, § 187),[1] the attempted murder of Kristian F. (§§ 187, 664), the first degree robbery of both Sells and Kristian (§ 211), and first degree residential burglary (§ 459). It found true special circumstance allegations of robbery murder (§ 190.2, subd. (a)(17)(A)) and burglary murder (§ 190.2, subd. (a)(17)(G)). After a penalty trial, the jury returned a verdict of death, and the trial court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I. FACTS

## A. Guilt Phase

### 1. The Prosecution's Case

#### a. The burglary, robbery, shootings, and defendant's arrest

On August 25, 1996, 16-year-old Kristian and her mother, Vanessa Sells, lived in a house on Sunlight Plaza in Los Angeles. In the early evening hours, Kristian was in her bedroom and heard her mother scream from the vicinity of the front door. When Kristian entered the hallway to check on her mother, she saw a man with a revolver in his hand and a bandana covering the bottom of his face. The masked man ordered her to lie on the floor; she complied. Sells then entered the hallway followed by a different man, later identified by Kristian as defendant. Defendant was also armed with a revolver, but was not wearing anything over his face. Defendant ordered Sells, who was crying, to lie on the floor next to her daughter.

Defendant stood watch over the two women as the masked man went through the house. Although Kristian tried to calm her crying mother, defendant threatened to shoot them if they were not quiet and cocked the gun for emphasis. He warned that they would be killed if they reported this incident to anyone. By this time, Sells was crying "very hard" and praying aloud. Defendant ordered Sells to go into her bedroom, followed her, and rummaged through her closet and inside some drawers. As he was looking through everything, he yelled at Sells—who was still crying—to be quiet.

Defendant returned to the hallway and yelled to the masked man to find something to use to tie up the women. Defendant remarked to Kristian that she was a "real pretty girl" and she was "lucky he [was] not Jeffrey Dahmer or he would rape [her]." The masked man produced a T-shirt, but defendant used a telephone cord instead to tie Kristian's hands behind her back and her hands to her feet. Defendant took a silver bracelet with the inscription "Jinneh" from Kristian's wrist and a silver necklace from her neck. He then carried her to her bedroom, placed her on the bed, and searched through her belongings. He ordered the masked man to unplug and take the radio. They then left the bedroom, leaving Kristian there.

From her bedroom, Kristian overheard defendant ask her mother about the location of her money. Sells directed him to her purse on the kitchen table. Shortly afterwards, defendant asked if there was any more money. Sells responded, "no" and explained that she had been laid off from her job two weeks earlier. When defendant inquired about a cellular phone, Sells told him

it was in her car. Kristian then heard her mother say she had been cooking and asked defendant to turn off the stove so that the house would not burn down. Defendant retorted, "Do you think this is a fucking joke or something?" He yelled to his masked accomplice, "She think we're playing with her."

Defendant returned to Kristian's bedroom and searched through her closet and dresser drawers. After a few minutes, defendant shouted to his accomplice to check if anyone was outside. The man responded that he saw some neighbors outside and told defendant to "hurry up." Defendant left Kristian's bedroom.

Kristian heard both men walking towards the front door and defendant say, "Fuck that. They're going to tell." She then heard a set of footsteps coming back into the house and the masked man say, "Hurry up." Kristian heard her mother scream "no," followed by three gunshots. Defendant appeared in Kristian's bedroom with a gun. He directed her to turn her head away from him, shot her once in the back of the head, and then shot her again. Pretending she was dead, Kristian closed her eyes and held her breath. Defendant went to the side of the bed where her head was facing and said "hey" to her, but she did not respond. He left the bedroom.

After Kristian thought the two men had left, she untied herself and called 911. While she was speaking to the 911 operator, Jerold Smith, a family friend, arrived and took the phone from her. Kristian tied a shirt around her head to decrease the bleeding and checked her mother. She found her mother tied with a telephone cord and lying motionless on the bedroom floor. Kristian began to cry and told her mother to get up. Her mother did not respond. When Kristian went outside to wait for the ambulance, she noticed that her mother's Lexus automobile was missing from the driveway.

At 7:17 p.m. the following evening, August 26, defendant made a 911 call. He told the operator that he had some helpful information about "some lady missing a Lexus," which had been reported on television, and that he had found the keys to that car. When asked how he found the keys, defendant claimed he saw two men—who appeared to be "dope smokers"—switch the license plates on a Lexus car. They abandoned the unlocked car; the keys were under the driver's seat. Defendant said he drove the car to a location near his house, claiming this had occurred around 3:25 p.m. that day. When the operator asked defendant if he would wait there for the police, he replied, "Hell no, they might kill my ass."

Defendant related the car was silver/bronze in color, like "what they [had] said on TV," and provided some crude directions to its location. When asked for better directions, defendant replied he could not stay there and said he would leave the keys on the roof of the car. When the operator asked defendant to place the keys under a mat instead, he refused, saying, "I ain't touching that car no more." When the operator pointed out that defendant had already touched the car, defendant responded, "I wiped my shit off." When the operator suggested defendant use his shirt sleeve to open the door handle and put the keys inside the car, defendant agreed.

Defendant asked if he would be "getting something for this," but refused to give his telephone number for fear the police would come to his house. Although defendant provided his name, race, and age, he refused to meet with the police and explained he did not want to "get labeled as no informant." Nevertheless, he related he was at a pay telephone across the street from a Fedco store, described his clothing, and added he had "real curly hair."

In the meantime, police officers responded to a radio broadcast regarding an auto theft and found the stolen Lexus car near Sunlight Plaza. The dispatcher directed the officers to the pay telephone from which defendant was calling, located about 10 blocks away. The officers found defendant— who was still talking to the operator and holding the keys to the Lexus car—and arrested him. They discovered Kristian's silver necklace and bracelet in defendant's pocket.

Five days after the shootings, Sells died from three gunshot wounds to the head and base of her skull and neck. Kristian survived, with a bullet still lodged inside her head at the time of trial.

### b. *Defendant's tape-recorded confession*

Shortly after defendant's arrest, Detectives Ray Morales and Bill Smith interviewed defendant. Initially, defendant denied any personal knowledge of, or involvement in, the crimes against Sells and Kristian. He claimed that, while walking around, he saw the Lexus car and recognized it from a television news report of the robbery and shooting that occurred the night before. He saw three "dope fiends" taking things from inside the car. After they left, defendant found the car keys inside the unlocked car and drove the car home. His mother warned defendant not to drive the car because the police were looking for it. Defendant asserted that Kristian's silver necklace and bracelet belonged to his sister.

When the detectives expressed disbelief at his story, defendant admitted he was involved in the crimes, but claimed that the other man—whom he called Charles Williams—was the mastermind. Although defendant did not want to be involved in the incident, he went along because Williams was bigger, had a gun, and had just gotten out of prison. At first, defendant asserted that Williams ordered the women on the ground, demanded money, shot the women, and stole their belongings. Defendant claimed that he was not armed and did not know Williams was going to shoot the women, and that Williams later gave him the stolen jewelry. Defendant volunteered that he turned off the stove when requested by Sells and suggested that the fact he was unmasked supported his nonculpability.

When the detectives continued to express their disbelief, defendant began admitting piecemeal his direct participation in the crimes. He maintained that Williams shot the women, claiming he only held the gun "for a minute," pointed it at the women when they were on the floor, tied up Kristian after Williams ordered him to do so, and carried Kristian into her bedroom. He admitted making a comment about Jeffrey Dahmer, but asserted he had to persuade Williams not to rape the victims.

Eventually defendant admitted he shot the victims, but claimed that Williams "made" him after he threatened to "get" defendant if he did not shoot them. He told the police he liked both women and did not want to shoot them.

### 2. The Defense's Case

At defendant's request, the trial court admitted a copy of a form defendant signed consenting to a search of his home. Otherwise, he rested on the state of the evidence and did not present any witnesses in the guilt phase.

### B. The Penalty Phase

### 1. The Prosecution's Case

In addition to relying on the circumstances of the charged offenses, the prosecution introduced evidence that defendant had committed two prior bicycle thefts and presented the testimony of Kristian, as well as that of Sells's father, regarding the impact of Sells's death.

The bicycle thefts occurred in 1991 and 1993. Defendant was 14 years old at the time of the first theft and 17 years old at the time of the second. Humberto Sanchez, whose bicycle was stolen in 1991, and the arresting officer testified. Regarding the 1993 offense, the prosecution introduced

documentary evidence to establish that the case was certified to adult court, where defendant suffered a conviction for second degree robbery with a finding that he used a BB gun during its commission. The parties stipulated that defendant was released from the former California Youth Authority (CYA) on July 9, 1996, less than two months before the crimes in this case.

### 2. *The Defense's Case*

The defense presented evidence relating to defendant's history of emotional and behavioral problems, his religious education, and his family background. The evidence included testimony of an early childhood diagnosis of attention deficit disorder (ADD) and the physical abuse inflicted on his mother by his stepfather.

Defendant testified about the physical abuse inflicted on him by his stepfather and the violence inflicted on him outside of the home. He was kidnapped and tortured when he was 12 years old, hit by a car when he was 13 years old, and shot in a driveby shooting when he was 16 or 17 years old. Regarding the crimes in this case, defendant essentially repeated the same statements made to the police. He admitted that he shot the two victims, but claimed that a man named "Lumpy" forced him to do so and to participate in the robbery. Defendant, who was not armed, acted out of fear because "Lumpy" was armed, had just been released from prison, and was older, physically bigger, and stronger than he was. He stated he did not intend or plan to rob or kill anyone. He apologized for what he did, but said there was nothing he could do to change it, and asked for "a chance to do something good in [his] life."

## II. DISCUSSION

### A. *Jury Selection Issues*

#### 1. *Peremptory Challenges*

Defendant, who is African-American, claims the prosecutor improperly exercised peremptory challenges against three African-American prospective jurors on the basis of race. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) The applicable law is well settled. Under *Wheeler, supra,* 22 Cal.3d 258, "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the

community under article I, section 16 of the state Constitution. [Citations.]" *(People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1008 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]" *(Ibid.,* citing *Batson, supra,* 476 U.S. at p. 88.)

"The United States Supreme Court has recently reaffirmed that *Batson* states the procedure and standard trial courts should use when handling motions challenging peremptory strikes. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " *(People v. Lewis and Oliver, supra,* 39 Cal.4th at pp. 1008–1009, quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410].)

Without objection from defense counsel, the prosecutor exercised her first peremptory challenge to excuse Prospective Juror D.T. and her fourth peremptory challenge to excuse Prospective Juror L.W. After the prosecutor used her 11th peremptory challenge to excuse Prospective Juror C.C., defense counsel made "a *Wheeler* motion" because the prosecutor had excused three prospective jurors who were African-American. The trial court found that based on the circumstances before it, it did "not find a prima facie case."

Nevertheless, the trial court then asked the prosecutor if she wanted to give an explanation "to protect the record." The prosecutor explained that as to Prospective Juror D.T., she "felt her answers here in court conflicted with her answers on her jury questionnaire, which made me feel very uncomfortable about her responses. That is why I kicked her." Regarding Prospective Juror L.W., the prosecutor recalled, "Her views on the death penalty were very weak. She seemed very uncomfortable with that decision. I think she said she would prefer not to sit on a death case." The prosecutor continued, "[She] said she had a problem with the death penalty. . . . [M]y feeling about her was because she said she had a problem with it and she was uncomfortable with making this kind of a decision, I didn't think she would ever make this decision." With respect to Prospective Juror C.C., the prosecutor stated, "His personality is such that I didn't think he would mix with the rest of the jurors, and I also had him as a weak juror on the death penalty. He wants to know everything. No one can know everything before making this decision.

And for that reason, I felt that he would be a weak juror on death. In fact, I scored him low even before he took the box."

The trial court denied defendant's *Wheeler/Batson* motion, stating, "Again, the court does not find a prima facie case," without articulating the standard used in finding that defendant failed to establish a prima facie case.[2] Nevertheless, defendant contends that reversal is required because the trial court presumptively used the wrong standard, i.e., whether defendant established a "strong likelihood" that a juror has been peremptorily challenged on the basis of group bias. (*Wheeler, supra*, 22 Cal.3d at p. 280.) The high court later disapproved that standard for purposes of a defendant's establishing a prima facie case. (*Johnson v. California, supra*, 545 U.S. at pp. 166–168.) Under *Batson*, the court stated, the prima facie burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California*, at p. 170.)

Here, we cannot be sure the court used the correct standard as later established by *Johnson v. California*. Regardless of the standard used by the trial court, we have reviewed the record independently (applying the high court's standard) to resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race. (*People v. Bonilla* (2007) 41 Cal.4th 313, 342 [60 Cal.Rptr.3d 209, 160 P.3d 84].) We conclude that the record does not support such an inference.

In establishing a prima facie showing, a defendant has the burden of demonstrating that the facts and circumstances of the case raise an inference that the prosecutor excluded prospective jurors based on race. (*Batson, supra*, 476 U.S. at p. 96.) In making such a showing, a defendant should make as complete a record of the circumstances as is feasible. (*Wheeler, supra*, 22 Cal.3d at p. 280.)

Here, in support of his *Wheeler/Batson* motion, defendant relied *solely* on the fact that, at that point, the prosecutor had used three of her 11 peremptory challenges to excuse African-American prospective jurors. He never claimed that the prosecutor used her peremptory challenges to strike most or all African-American prospective jurors from the jury venire (*Wheeler, supra*, 22 Cal.3d at p. 280) or that there were no African-American prospective jurors remaining on the jury panel—consisting generally of 18 prospective jurors—when the *Wheeler/Batson* motion was made. Thus, the record is silent as to

---

[2] Although the court asked the prosecutor for her reasons, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied. (*People v. Boyette* (2002) 29 Cal.4th 381, 422 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Welch* (1999) 20 Cal.4th 701, 746 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

the number of African-American prospective jurors, if any, who were included in the entire jury venire or in the jury panel when the motion was made. Further, the record is silent regarding the racial composition of the jury that ultimately tried and sentenced defendant. (Contrast *Johnson v. California, supra*, 545 U.S. at pp. 164–165, 173 [of 43 eligible prospective jurors, only three were Black; prima facie case established where prosecutor used three of his 12 peremptory challenges to remove *all* Black prospective jurors and defendant was tried by all-White jury].) Defendant's cursory showing (see *People v. Yeoman* (2003) 31 Cal.4th 93, 115 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [cursory reference to prospective jurors by name, number, occupation, and race insufficient]; *People v. Farnam* (2002) 28 Cal.4th 107, 136–137 [121 Cal.Rptr.2d 106, 47 P.3d 988]), along with the relatively "small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible." (*People v. Bell* (2007) 40 Cal.4th 582, 598 [54 Cal.Rptr.3d 453, 151 P.3d 292].) Moreover, the prosecutor's race-neutral reasons for the excusals confirmed the trial court's finding that there was insufficient evidence to permit the court to draw an inference that discrimination had occurred.[3] Because defendant failed to meet his burden of establishing a prima facie case of group discrimination, the trial court correctly denied his *Wheeler/Batson* motion.

### 2. *Challenges for Cause*

■ Defendant contends that his right to an impartial jury under the federal and state Constitutions was violated because the trial court erred in excusing two prospective jurors for cause. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Moon* (2005) 37 Cal.4th 1, 13 [32 Cal.Rptr.3d 894, 117 P.3d 591].) "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519], quoting *Wainwright v. Witt, supra*, 469 U.S. at p. 424.) "On review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding. If there is no inconsistency, the reviewing court will uphold the court's ruling if substantial evidence supports it." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

---

[3] For the first time on appeal, defendant argues that the prosecutor's use of strikes should be subjected to a comparative juror analysis. We decline to do so in this "first-stage" *Wheeler/Batson* case. (*People v. Bonilla, supra*, 41 Cal.4th at p. 350; cf. *People v. Lenix* (2008) 44 Cal.4th 602 [80 Cal.Rptr.3d 98, 187 P.3d 946].)

The trial court excused two prospective jurors for cause. As will appear, because the excused prospective jurors indicated either that they were not prepared to impose the death penalty or were undecided as to their ability to do so, the trial court did not err in excusing them. (*People v. Cunningham, supra,* 25 Cal.4th at p. 982.) Moreover, at the least, the potential jurors' statements were equivocal and conflicting regarding their ability to render a death verdict. (*People v. Moon, supra,* 37 Cal.4th at p. 14.) Thus, we must defer to the trial court's determination of their states of mind.

### a. *Prospective Juror A.R.*

In her questionnaire, Prospective Juror A.R. stated that she was generally against the death penalty, but that her view might be impacted if her own family member or friend had been murdered. She explained that she felt that way about the death penalty because "I don't believe anyone has the right to choose who lives or dies, unless acting in self defense." When asked if her feelings about the death penalty were "very strong," Prospective Juror A.R. responded, "yes" and explained, "My feelings are pretty set—but I have no way to know if an individual case m[a]y impact them."

Prospective Juror A.R. agreed with the statements "you should hear all of the circumstances surrounding a case" and "you should hear and review all of the circumstances concerning the defendant and his background before deciding between the penalties of life without parole and death." On the other hand, when asked, "in what cases do you believe the death penalty may be appropriate?" she replied, "none." When asked, "in what cases do you believe the death penalty may not be appropriate?" she answered, "all." Given two options in the appropriate case, she could see herself rejecting the death penalty and choosing life without the possibility of parole, but could not see herself rejecting life imprisonment and choosing death.

The questionnaire further asked, if defendant were found guilty of first degree murder and the felony-murder special-circumstance allegation were found to be true, would she always vote for death and reject life without parole, regardless of the evidence at the penalty phase. Prospective Juror A.R. circled "no." However, when the same hypothetical was posed in terms of whether she would always vote for life without parole and reject death regardless of the evidence at the penalty phase, Prospective Juror A.R. circled "yes," and wrote in, "I don't know." Regarding the felony-murder special-circumstance allegation, she indicated that she "strongly disagree[d]" that "anyone who commits murder during the course of a robbery or burglary should always get the death penalty," but "agree[d] somewhat," that "anyone who commits murder during the course of a robbery or burglary should never get the death penalty."

In response to the trial court's questions, Prospective Juror A.R. reiterated that she was against the death penalty in theory, and that she could not see herself rejecting life imprisonment and choosing the death penalty. She acknowledged there may be cases in which she might vote for the death penalty, although she would "still have great difficulty." When asked to elaborate, she replied, "I guess I don't know the specifics. I guess I would have to be presented with the information that would make me feel that way." The court responded that it could not present particular facts, but attempted to explore the topic further. In response to more questions from the court, Prospective Juror A.R. indicated that certain circumstances relating to malice, remorse, and life experiences might influence her to choose the death penalty. The court then asked if she could "see [her]self voting for death if [she] thought it was appropriate" in the following situation: she found defendant guilty of first degree murder, determined the truth of the special circumstance allegation, and decided that the aggravating factors outweighed the mitigating factors. Prospective Juror A.R. stated she could not answer that question, but assured the court she could give both sides a fair trial. Defense counsel refused to stipulate to an excusal for cause.

Later, during questioning by the prosecutor, Prospective Juror A.R. acknowledged that, although it was difficult for her to envision circumstances in which she would vote for death, she asserted that she could vote for the death penalty "if the circumstances would allow me to do that." She would consider the heinousness of the crime, the person who committed it, and whether the victim had been tortured. But when the prosecutor asked, "When it comes right down to it, do you really feel that you could ever say death?" Prospective Juror A.R. answered, "I guess I don't know."

In granting the prosecutor's challenge for cause, the trial court reasoned, "She takes a long time in answering. She is obviously struggling; this is difficult for her. It's clear to me this is something that would be almost impossible. She might come up with some imaginary situation, but I find she would be substantially impaired and I do find cause." In response to the court's invitation for further argument, defense counsel said, "submitted," and the court reiterated, "I do find cause."

As in *People v. Schmeck* (2005) 37 Cal.4th 240, 262 [33 Cal.Rptr.3d 397, 118 P.3d 451], defendant merely submitted the question to the trial court. "Hence, as a practical matter, he 'did not object to the court's excusing the juror, but . . . also refused to stipulate to it.' (*People v. Cleveland* (2004) 32 Cal.4th 704, 734 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Although 'this failure to object does not forfeit the right to raise the issue on appeal, . . . it does suggest counsel concurred in the assessment that the juror was excusable.' (*Id.* at pp. 734–735; see *Witt, supra,* 469 U.S. at pp. 434–435 [in light of

counsel's failure to question the prospective juror or object to her excusal for cause, 'it seems that . . . no one in the courtroom questioned the fact that her beliefs prevented her from sitting'].)" (*People v. Schmeck, supra*, 37 Cal.4th at p. 262.)

Moreover, as did the prospective juror in *People v. Moon, supra*, 37 Cal.4th 1, Prospective Juror A.R. gave equivocal answers and was "less than consistent in her answers." (*Id.* at p. 15.) " 'In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' (*People v. Fudge* (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].)" (*People v. Moon, supra*, 37 Cal.4th at pp. 15–16.)

Here, the trial court found sufficient cause for excusal based on its observation of Prospective Juror A.R.'s demeanor, her equivocal and conflicting responses, and her inability to state her views. (*People v. Schmeck, supra*, 37 Cal.4th at p. 262 [excusals for cause proper where prospective jurors could not state they would be able to consider imposing the death penalty, either in any case or in the kind of case at issue there].) " ' "[W]e pay due deference to the trial court, which was in a position to actually observe and listen to the prospective jurors. Voir dire sometimes fails to elicit an unmistakably clear answer from the juror, and there will be times when 'the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.' " ([*People v. Cain* (1995) 10 Cal.4th 1, 60 [40 Cal.Rptr.2d 481, 892 P.2d 1224],] [q]uoting *Wainwright v. Witt, supra*, 469 U.S. [at p.] 426.)' (*People v. Griffin* [(2004)] 33 Cal.4th [536,] 559 [15 Cal.Rptr.3d 743, 93 P.3d 344].)" (*People v. Moon, supra*, 37 Cal.4th at p. 14; see also *People v. Schmeck, supra*, 37 Cal.4th at p. 263.) Deferring to the trial court's assessment of her state of mind, we conclude that Prospective Juror A.R. was properly excused.

### b. *Prospective Juror N.T.*

Prospective Juror N.T.'s responses in her questionnaire and on voir dire reflected that she had been a volunteer tutor and counselor at the CYA for five years. She indicated that, because of her prior CYA experience, she tended to favor the defense in terms of sympathy or compassion and had an "uneasy feeling" about imposing "such a permanent punishment" as the death penalty.

Although Prospective Juror N.T. related in her questionnaire that she believed she should hear all of the evidence before deciding the penalty, her responses on voir dire reflected otherwise. She asserted she would be "more inclined to vote for life instead of death." When questioned by the trial court if she could "ever vot[e] for death," she replied, "I don't believe I could." When asked if there was any circumstance in which she would vote for death, she responded she would "lean towards dea[th]" in cases involving "serial killers." When questioned by the prosecutor, Prospective Juror N.T.'s responses became more definitive. Initially, she stated it "would be very difficult" for her ever to vote for death. When questioned again if she could see herself ever voting for the death penalty, she responded, "In this case, knowing what I know, I don't think so." She explained that, because the case did not involve "an extreme mass murder," she could not return a death verdict. As a final clarification, the prosecutor asked, "As far as you are concerned, the only case you could see yourself personally ever voting for the death penalty would be in a situation where there was a mass murder?" Prospective Juror N.T. replied, "I would have to be shown that, yes." When the court asked defense counsel if he wanted to question Prospective Juror N.T., counsel responded "no."

The record here supports the trial court's decision to excuse Prospective Juror N.T. for cause. (*People v. Mendoza* (2000) 24 Cal.4th 130, 169 [99 Cal.Rptr.2d 485, 6 P.3d 150] [prospective juror's assertion he could never impose the death penalty in a case that did not involve mass murder supported excusal for cause]; see also *People v. Ochoa* (2001) 26 Cal.4th 398, 430–432 [110 Cal.Rptr.2d 324, 28 P.3d 78] [prospective juror's belief he could not consider voting for death in case at hand supported excusal for cause].) Again, defense counsel's failure to object suggests counsel concurred in the assessment that the juror was excusable. (*People v. Schmeck, supra,* 37 Cal.4th at p. 262.) To the extent her responses could support multiple inferences, we defer to the trial court's determination of her unfitness to serve. (*People v. Ochoa, supra,* 26 Cal.4th at p. 432.)

## B. *Guilt Phase Issues*

### 1. *Suppression Motion*

At trial, defendant moved to suppress evidence of his videotaped confession to the police on the ground that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]). The trial court denied the motion, finding that defendant had impliedly waived those rights. A redacted copy of defendant's videotaped statement was played for the jury. On appeal, he contends that the trial court erred in denying his suppression motion. We conclude that the claim lacks merit.

Los Angeles Police Department Detectives Ray Morales and Bill Smith interrogated defendant around 9:24 p.m. on the day of defendant's arrest. At the beginning of the interview, Detective Morales advised defendant of his *Miranda* rights as follows:

"[Det. Morales:] Before we get started, I just want to go over some of your rights, okay? It's kind of important. I want you to pay attention to this, all right?

"[Defendant:] Mmnh-mmnh.

"[Det. Morales:] You have the right to remain silent.

"If you give up the right to remain silent, anything you say can and will be used against you in a court of law.

"You have the right to speak with an attorney and to have the attorney present during questioning.

"If you so desire and cannot afford one, an attorney will be appointed for you without charge before questioning.

"Carlos, do you understand these rights I've explained to you?

"[Defendant:] Yes.

"[Det. Morales:] Okay.

"Now, uh, why don't you tell me a little bit about how—what happened tonight with this car?

"[Defendant:] Uh—

"[Det. Morales:] In your own words . . . .

"[Defendant:] Okay."

As reflected above, Detective Morales advised defendant of his *Miranda* rights and asked him if he understood them. After defendant answered in the affirmative, Detective Morales immediately proceeded to question defendant without requesting an oral or written waiver. Defendant renews his claim that his *Miranda* rights were violated because he did not expressly or impliedly waive those rights before the interview.

■ "In reviewing defendant's claim that his *Miranda* rights were violated, we must accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the credibility of witnesses where supported by substantial evidence. [Citations.] *Miranda* makes clear that in order for defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel. [Citation.]

"It is further settled, however, that a suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or refusal to talk bars further questioning. [Citation.]

"Although there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 667–668 [80 Cal.Rptr.3d 126, 187 P.3d 970].)

Here, defendant testified at the suppression hearing. He stated that the detective who interviewed him was not in uniform, did not have a gun, and was "okay" to him. At the time defendant was advised of his *Miranda* rights, the detective was speaking in a "regular tone of voice" and did not yell at defendant. At that point, defendant was not scared or intimidated.

Although the officer gave him his *Miranda* rights and he said he understood them, defendant claimed that he, in fact, did not understand he had the right to remain silent, to speak with an attorney, to have one present during questioning, and to have an attorney appointed if he could not afford one. Nevertheless, he did not ask the detective for clarification. Defendant asserted that he spoke with the police only because they promised him, once before the interview and several times during the interview, that he could go home if he cooperated with them. Although the police drew their guns and handcuffed him when they apprehended him at the telephone booth, defendant claimed he did not believe he was under arrest. The police never said he was under arrest or was a suspect in a murder/robbery, but only told him he was being detained as a witness for the theft of the Lexus automobile he possessed.

On cross-examination, defendant acknowledged that, as a juvenile, he had been arrested many times before, had been represented by counsel in past juvenile proceedings on more than one occasion, had pleaded guilty to criminal charges several times while represented by counsel, and had been advised of his constitutional rights during those prior arrests and guilty plea proceedings. He asserted that he also did not understand his rights on those occasions, yet never asked the police, his attorneys, or the court for an explanation. He also acknowledged that during the interview, the police provided him with food.

After watching defendant's videotaped statement and listening to defendant's testimony at the suppression hearing, the trial court denied the suppression motion. It determined that defendant had impliedly waived his *Miranda* rights and that the waiver was voluntary and knowing. The court found not credible defendant's testimony that (1) he did not understand his *Miranda* rights, (2) he believed he was detained and questioned only as a witness to the theft of the Lexus automobile, and (3) the police repeatedly assured him he could go home if he cooperated.

On the first finding, the court noted that the admonitions were simple and straightforward and that defendant was "not unsophisticated with respect to his contact with the [legal] system." On the second finding, the court found that defendant's later statements during the interview reflected he clearly knew the significance of his being present presence with the car, especially since defendant later admitted "having been present and having done the shooting." The court reasoned, "I think he was, of course, hoping that they wouldn't get to the other harder questions, but that hope does not invalidate his voluntariness in responding to the questions." On the third finding, the court noted that the videotape of the interview showed that the officers never assured defendant he could go home if he answered their questions, thereby contradicting his testimony. The court observed from the videotape that the interviewing detective's demeanor was "low key," he never cut defendant off, and he gave defendant an opportunity to invoke his rights. The court further observed that defendant "appeared to be quite eager to give his side. He goes on and on and on in the initial statement. The officers hardly say anything other than a word here or there as he is proceeding through the initial presentation to the officers."

Based on the totality of the circumstances surrounding the interrogation, we find that defendant's willingness to answer questions after expressly affirming his understanding of his *Miranda* rights constituted a valid implied waiver of them. (*People v. Cruz, supra*, 44 Cal.4th at pp. 668–669.) The record reflects that defendant was aware of the rights he was abandoning and of the consequences of his decision, and voluntarily waived his rights with

the intention of deceiving the officers. As the trial court observed, defendant had been admonished as to his *Miranda* rights during his prior experiences with the criminal justice system. As the trial court further observed, defendant "appeared to be quite eager to give his side." Indeed, defendant admitted that, at the time of the *Miranda* admonitions, he was not afraid of or intimidated by the police.

Defendant's answers were clear and responsive to the questions asked of him. (*People v. Whitson* (1998) 17 Cal.4th 229, 245 [70 Cal.Rptr.2d 321, 949 P.2d 18].) Initially, he attempted to deceive the officers by claiming that he took the Lexus car after three strange men had abandoned it. Even while maintaining this story, defendant readily admitted that he knew the car had been connected with an alleged murder/robbery, the account of which he saw on the news the previous night. Because defendant knew the connection between the Lexus car and the crimes, he could not have reasonably believed the police were interested in questioning him only as a witness regarding an auto theft. In any event, the Constitution does not require "that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." (*Moran v. Burbine* (1986) 475 U.S. 412, 422 [89 L.Ed.2d 410, 106 S.Ct. 1135].)

At no time did defendant request the presence of counsel or attempt to terminate the detectives' questioning. The police did not resort to physical or psychological pressure or improper promises to elicit statements from defendant, and did not wear defendant down by improper interrogation tactics. (*People v. Whitson, supra,* 17 Cal.4th at pp. 248–250.) Although defendant testified that he did not understand his *Miranda* rights and believed he was being detained and questioned only as a witness to the theft of the Lexus automobile, and the police repeatedly assured him he could go home if he cooperated, the interview videotape and defendant's suppression hearing testimony support the court's rejection of that testimony. Thus, we must accept the court's evaluation of defendant's credibility. (*People v. Whitson, supra,* 17 Cal.4th at p. 248.)

■ Accordingly, we find that defendant's *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation.

## 2. *Instructional Issues*

### a. *First degree felony-murder instruction*

Defendant contends that, because the information charged him only with murder in violation of section 187, subdivision (a) (which defines second

degree murder), the trial court lacked jurisdiction to try him for first degree murder and prejudicially erred in instructing the jury on the "uncharged crime" of first degree felony murder. We reject this contention.

We have held for nearly a century that if the charging document charges the offense in the language of the statute defining murder (§ 187), the offense charged includes murder in the first degree and murder in the second degree. (*People v. Witt* (1915) 170 Cal. 104, 107–108 [148 P. 928] (*Witt*).) Thus, defendant's underlying premise that the information charged him only with second degree murder is incorrect. (*People v. Zamudio* (2008) 43 Cal.4th 327, 362 [75 Cal.Rptr.3d 289, 181 P.3d 105]; *People v. Harris* (2008) 43 Cal.4th 1269, 1294–1295 [78 Cal.Rptr.3d 295, 185 P.3d 727]; *People v. Wilson* (2008) 43 Cal.4th 1, 21 [73 Cal.Rptr.3d 620, 178 P.3d 1113].)

Defendant further argues that, under *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], felony murder and premeditated murder are separate crimes, and that *Dillon* implicitly overruled *Witt, supra,* 170 Cal. 104 (defendant may be convicted of felony murder even though information charged only murder with malice). We have consistently rejected that same claim (*People v. Morgan* (2007) 42 Cal.4th 593, 617 [67 Cal.Rptr.3d 753, 170 P.3d 129]; *People v. Harris, supra,* 43 Cal.4th at pp. 1294–1295; *People v. Geier* (2007) 41 Cal.4th 555, 591 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432]) and continue to do so. Thus, the trial court correctly instructed on felony murder and the jury, in returning a general verdict for first degree murder, did not convict defendant of an uncharged offense.

b. *Failure to instruct that jurors must agree unanimously on theory of first degree murder*

The trial court instructed the jury on first degree premeditated murder and on first degree felony murder predicated on the commission or attempted commission of a robbery or a residential burglary. The court did not instruct the jury that it must agree unanimously on a theory of first degree murder (i.e., premeditated murder or felony murder) to find him guilty of that charge. Defendant argues that this instructional omission was prejudicial error. We have repeatedly held that a unanimity instruction is not required. (*People v. Zamudio, supra,* 43 Cal.4th at pp. 362–363; *People v. Harris, supra,* 43 Cal.4th at p. 1295; *People v. Morgan, supra,* 42 Cal.4th at p. 617; *People v. Cole* (2004) 33 Cal.4th 1158, 1221 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1131 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Box* (2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130].) In any event, the jury unanimously found to be true the felony-murder special-circumstance allegations. Therefore, the jury unanimously agreed with

a first degree felony-murder theory. (*People v. Harris, supra,* 43 Cal.4th at p. 1296; *People v. Carpenter* (1997) 15 Cal.4th 312, 395 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

## C. *Penalty Phase Issues*

### 1. *Alleged Prosecutorial Misconduct*

Defendant claims that the prosecutor's pervasive and egregious misconduct during the penalty phase cross-examination of the defense expert, defendant's mother, and defendant deprived him of due process and a reliable sentence determination. We disagree.

■ The standards governing review of misconduct claims are settled. A prosecutor commits misconduct under the federal Constitution when his or her conduct infects the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Hinton* (2006) 37 Cal.4th 839, 862 [38 Cal.Rptr.3d 149, 126 P.3d 981].) Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct even when those actions do not result in a fundamentally unfair trial. (*People v. Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 [63 Cal.Rptr.3d 433, 163 P.3d 118].)

The Attorney General argues that many of the prosecutorial misconduct claims have been forfeited for failure to object. We have read the record and determined that, except where we have found forfeiture, defendant made sufficient objections.

### a. *Cross-examination of defense expert Dr. Adrienne Davis*

Defendant claims that, during cross-examination of defense expert Dr. Adrienne Davis, the prosecutor committed misconduct by questioning her about the disciplinary violations reflected in defendant's CYA and probation records.

On direct examination, Dr. Davis testified that she was retained by the defense to examine defendant's psychological history and to form an opinion about aspects of his history important in understanding his commission of the offenses in this case. In forming her opinion, Dr. Davis reviewed defendant's

school records, juvenile records, and his videotaped interview with the police, and conducted interviews of defendant, his parents, and his sister.

Dr. Davis noted that defendant had a history of behavioral and emotional problems which stemmed largely from having ADD, a neurological condition he was diagnosed with early in his childhood. Because it is believed that ADD is caused by a chemical imbalance in the brain, ADD is often treated with medication. She testified that children with ADD, such as defendant, are hyperactive and very disruptive, have very little control over their behavior, have difficulty learning, and are intrusive in their interactions with other people. They are particularly impulsive in stressful situations. Dr. Davis opined that, because ADD is a neurologically based disease, "a lot of this [negative] behavior the child is exhibiting is not volitional, they are not doing it on purpose, they just don't really have control."

Dr. Davis believed that a child with ADD is predisposed to aggressive and delinquent behavior, especially if he or she is not treated with medication, there is no family intervention, and there is aggressive behavior in the family and community. Dr. Davis stated that, after defendant was diagnosed with ADD, he did not receive proper treatment, was not given medication, and did not undergo family or individual counseling. Dr. Davis noted that defendant was medicated while housed at CYA, but she believed that he stopped taking his medication after his release.

On cross-examination, Dr. Davis confirmed she had reviewed and considered defendant's CYA records. When asked if the records reflected that defendant engaged in criminal conduct while he was incarcerated and receiving treatment for his ADD, Dr. Davis answered that they did not and explained that fighting with other minors is not a crime. Defense counsel objected to questions about defendant's criminal behavior in CYA on grounds of relevance and that the questioning was argumentative. After argument outside the presence of the jury, the trial court noted that Dr. Davis relied on the CYA reports in forming her opinions and that the prosecutor's questions regarding the contents of the reports were proper rebuttal and impeachment.

In the presence of the jury, Dr. Davis confirmed that defendant's records reflected that defendant had been disciplined for theft, possession of a weapon, sexual harassment, and engaging in two fights while in CYA. One report indicated that, even while on medication, defendant was still a serious behavior problem. Through further cross-examination, the prosecutor established that, while medication and counseling were provided to defendant in CYA, he generally did not respond to treatment.

Defendant argues that Dr. Davis's testimony regarding the disciplinary violations in CYA was improper nonstatutory aggravating evidence and

exceeded the scope of direct examination, and that the prejudicial effect of the evidence outweighed its probative value. Defendant further argues that the prosecutor failed to give proper notice of the nonstatutory aggravating evidence. Initially, we note that defendant failed to object on the ground that the testimony was improper nonstatutory aggravating evidence or that the prosecutor failed to give notice regarding the evidence. Having made no objection, defendant has forfeited the claims on appeal. (*People v. Alfaro, supra*, 41 Cal.4th at p. 1328.) In any event, because the underlying arguments lack merit, the claim of prosecutorial misconduct necessarily fails as well.

■ The prosecution may present only aggravating evidence that relates to statutory factors enumerated in section 190.3. (*People v. Boyd* (1985) 38 Cal.3d 762, 772–776 [215 Cal.Rptr. 1, 700 P.2d 782] (*Boyd*).) However, evidence offered to rebut defense mitigating evidence need not relate to any specific aggravating factor listed in section 190.3. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 109 [17 Cal.Rptr.3d 710, 96 P.3d 30].) On rebuttal, a prosecutor may refer to prior conduct not admitted as evidence in aggravation under section 190.3, if it relates to evidence offered by the defendant in mitigation. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1023.) A prosecutor does not violate *Boyd* by showing that the evidence in mitigation offered by the defendant fails to carry extenuating weight when evaluated in a broader factual context. (*People v. Frye, supra*, 18 Cal.4th at p. 1021.)

Here, cross-examination was not conducted to establish evidence in aggravation, but to impeach Dr. Davis's opinions. On direct examination, Dr. Davis suggested that, because of his ADD, defendant acted impulsively and did not engage in volitional behavior during the commission of the crimes. In rebuttal, the prosecutor properly showed that despite receiving treatment for his ADD in CYA, defendant committed various disciplinary violations. This evidence rebutted Dr. Davis's opinion that defendant suffered from ADD and that the disease contributed significantly to his criminal conduct in this case. In turn, it was relevant to establish that, instead of acting impulsively and without volition and control, defendant intentionally committed the offenses in this case. Thus, the prosecutor did not commit misconduct in attempting to reduce the weight of Dr. Davis's expert opinion. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at pp. 111–112; *People v. Dennis* (1998) 17 Cal.4th 468, 519 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Montiel* (1993) 5 Cal.4th 877, 923–924 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

Because defendant's assertion of *Boyd* error lacks merit, his related notice claim also fails. (§ 190.3 ["Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation."]; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 109.) Similarly, for the reasons

stated above, we reject defendant's contention that evidence of the disciplinary violations exceeded the scope of direct examination and was more prejudicial than probative under Evidence Code section 352. (Evid. Code, § 721, subd. (a) ["[A] witness testifying as an expert . . . may be fully cross-examined as to . . . the subject to which his or her expert testimony relates, and . . . the matter upon which his or her opinion is based and the reasons for his or her opinion."]; *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713] [courts have considerable discretion to control the manner in which an expert is questioned and to weigh the probative value of information relied on by an expert against the risks].)

Regarding the potential for undue prejudice or that the jury would consider the evidence of defendant's disciplinary violations as substantive evidence in aggravation, any such danger was dispelled by the trial court's admonition. (*People v. Montiel, supra,* 5 Cal.4th at p. 919.) It admonished the jury that the reports on which Dr. Davis's opinions were based were hearsay and not offered for their truth, but only admitted for the purpose of evaluating the expert testimony. Moreover, the prior disciplinary violations were relatively tame given the calculated, methodical, and callous nature of the crimes in this case, to which defendant confessed. Because the trial court did not abuse its discretion in permitting cross-examination as to the disciplinary violations, the prosecutor did not commit misconduct.[4]

Defendant further contends that the prosecutor went outside the scope of permissible cross-examination and thereby committed misconduct when she questioned Dr. Davis about the factual inaccuracies in her report. On cross-examination, Dr. Davis acknowledged her report inaccurately stated that the charge was second degree robbery rather than first degree robbery, that Sells was shot three times in the head and back when in fact she was shot three times in the head, and that her assertion in the report that Kristian survived and is in good physical condition was made without the knowledge that she still had a bullet in her head. In offering an expert opinion, the expert invites investigation into the extent of his or her knowledge, the reasons for the opinion, including facts and other matters upon which it is based and which he or she took into consideration; and he or she may be subjected to the most rigorous cross-examination concerning his or her opinion and its sources. (*People v. Nye* (1969) 71 Cal.2d 356, 374–375 [78 Cal.Rptr. 467, 455 P.2d 395].) Because the report's inaccuracies tended to downplay the severity of the crimes, the prosecutor

---

[4] In arguing that the trial court failed to exercise its discretion under Evidence Code section 352, defendant points to a comment made by the court. During its ruling, the court stated, "At some point I am going to be dealing with 352, but I'm going to overrule the objection at this point." This ruling was made *before* the prosecutor elicited evidence of the specific disciplinary violations committed by defendant in CYA. Given the timing of the court's ruling, the court's comment reflected it was exercising its discretion at that point, but it might need to reweigh the evidence after it heard additional testimony.

was entitled to question Dr. Davis about those inaccuracies in attempting to rebut her suggestion that defendant's criminal conduct here was uncontrolled and not volitional.

Finally, defendant claims that the prosecutor committed misconduct in cross-examining Dr. Davis regarding defendant's lack of remorse for committing the offenses in this case and in other cases. Regarding this case, the prosecutor was entitled to develop and argue the lack of evidence of remorse. (*People v. Frye, supra*, 18 Cal.4th at p. 1019; *People v. Marshall* (1996) 13 Cal.4th 799, 855 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Regarding the other cases, various statements in the reports indicated defendant minimized his criminal behavior and showed little remorse towards his victims. The prosecutor could have reasonably concluded that those statements impeached Dr. Davis's opinion regarding defendant's emotional and behavioral stability. In any event, because the trial court overruled defendant's objection, the prosecutor's questions, in accord with the ruling, were not misconduct.

### b. *Cross-examination of defendant's mother*

On direct examination, defense counsel questioned Brenda Sampson, defendant's mother, about defendant's behavior and progress in school. Sampson testified that, during elementary school, defendant was not "really a bad child." When asked if some problems had been brought to her attention, Sampson replied, "A little. Not much to really complain about." When asked if defendant had been disruptive and would cause trouble in school, she responded, "Not really." Instead, she blamed his problems in school on the other children who had picked on him. When asked if defendant's problems continued in junior high school, Sampson stated, "A little, but I think they had put him in special education." Although it had been recommended that defendant undergo psychological counseling, Sampson could only afford two or three counseling sessions.

When asked about the appropriate punishment for her son, Sampson testified that she wanted him to live. She explained, "I don't feel that he did it and I don't feel that he has no anger or nothing in his heart like he would want to hurt anyone. I never had any problem with him, you know, wanting to hurt me or none of my children or anyone that I know."

Out of the presence of the jury, the prosecutor asked permission of the court to question Sampson about defendant's prior violent conduct. The prosecutor sought to impeach Sampson by asking if she knew about the adult robbery conviction and the juvenile robbery adjudication that the prosecution had presented in aggravation. She also sought to use his admitted gang activity and a "nondetained" petition for a robbery defendant was alleged to

have committed at age 12—evidence that had not been presented by the prosecution in aggravation. The trial court ruled that the prosecutor could not question Sampson about the gang activity or about the nondetained juvenile petition.

In addition, the prosecution sought to question Sampson about her knowledge of defendant's involvement in the juvenile system since the age of 11, having had a 90-day CYA diagnostic evaluation for petty theft. The prosecutor argued that, although defendant had been in the juvenile justice system, Sampson "makes it sound like he had some problems at school and that was it." The trial court allowed the prosecutor to question Sampson about the 90-day diagnostic examination for petty theft. It explained, "I don't think that is that damaging, but it does show there are problems."

On cross-examination of Sampson, the prosecutor referred to her testimony on direct that "defendant had not been involved in any trouble to complain of" and asked if she was aware of the 90-day CYA diagnostic evaluation. Initially, Sampson stated she did not remember, but then recalled the incident after being reminded that defendant had been gone from home for 90 days. The prosecutor then questioned Sampson about her knowledge of the two robbery convictions that the prosecution had presented in aggravation.

Defendant does not contest the cross-examination regarding the robbery convictions. Rather, he argues that, by questioning Sampson about the 90-day diagnostic examination, the prosecutor committed misconduct because the questioning exceeded the scope of direct examination and constituted inadmissible nonstatutory aggravating evidence of which he did not receive proper notice. We disagree.

A prosecutor may impeach evidence of the defendant's good character with rebuttal evidence of bad character, and is not bound by the statutory aggravating factors or by the prosecutor's statutory pretrial notice of aggravating evidence. (*People v. Fierro* (1991) 1 Cal.4th 173, 237 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Here, the challenged cross-examination was not offered as evidence in aggravation, but to impeach the evidence presented in mitigation. Because Sampson characterized defendant as not "really a bad child" and minimized any problems with defendant, the prosecutor was entitled to impeach that testimony by questioning her about her knowledge of defendant's 90-day CYA diagnostic evaluation. (*People v. Payton* (1992) 3 Cal.4th 1050, 1066 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *People v. Fierro, supra*, 1 Cal.4th at pp. 238–239.) Moreover, we reject defendant's claim that the trial court "abdicated its duty to control the introduction of unduly prejudicial evidence under Evidence Code section 352." In allowing questioning, the trial court commented that evidence about the diagnostic evaluation was not that

damaging. Also, by excluding evidence about defendant's nondetained petition for robbery and his gang involvement, and by allowing questioning on the robberies of which the jury was already aware, the trial court clearly engaged in the required weighing process. Because we find no error, the related claim of prosecutorial misconduct necessarily fails.

### c. Cross-examination of defendant

Defendant complains of several instances of prosecutorial misconduct committed during his cross-examination. First, defendant argues that, when questioning him about the differences between his account of the 1991 bicycle theft and that testified to by the arresting officer, the prosecutor improperly asked him if the officer had lied during his testimony. Deputy Sheriff Tom Fortier testified that he stopped defendant and another suspect together. Each of them had a bicycle. Humberto Sanchez, the victim, identified defendant and the other person as having stolen his and his friend's bicycles. Defendant told Deputy Fortier that he approached Sanchez, ordered him off his bicycle, and rode off with it. But Sanchez told Fortier that defendant ordered him off the bicycle and punched him in the face. After a brief fight, defendant rode off with Sanchez's bicycle.

During cross-examination, defendant admitted that he rode off with Sanchez's bicycle, but denied that he hit or punched Sanchez. He claimed that he was only a bystander, having taken Sanchez's bicycle after two other people—whom defendant did not know—ordered Sanchez off. He rode off with the bicycle while those two people fought with Sanchez. Contrary to Deputy Fortier's testimony, defendant claimed that he knew nothing about the second bicycle theft, that he was arrested alone, and that the other suspect was arrested at another location by a different officer.

The following testimony followed:

"Q. You heard Deputy Fortier testify here yesterday that he was directed to a location where there were two suspects with bicycles, and he arrested both of them there at that location, didn't you?

"A. Yes.

"Q. Isn't that how it happened?

"A. No, it's not.

"Q. *So Deputy Fortier lied?*

"A. I'm not going to call him a liar, but I would say that that statement is incorrect.

"Q. So the bottom line is you do not take full responsibility for what occurred on that day in April when you took that bike?

"[Defense counsel]: Objection, argumentative.

"[Defendant]: Yes, I do.

"The Court: Overruled.

"[Prosecutor]: Pardon?

"A. Yes, I do.

"Q. Well, then how do you explain the difference between what you say occurred and what Deputy Fortier said occurred with respect to your arrest?

"[Defense counsel]: Objection, speculation.

"The Court: Overruled. You can answer, sir. [¶] . . . [¶]

"A. It's because I was the person who was arrested. He [Fortier] was not."

Defendant claims that the prosecutor's question as to whether Deputy Fortier lied invaded the province of the jury regarding credibility determinations, elicited improper lay opinion about the veracity of witnesses, and constituted misconduct by attempting to induce defendant to call a law enforcement witness a liar. We disagree.

Having made no objection to that particular question and having sought no curative admonition, defendant has forfeited the claim on appeal. (*People v. Alfaro, supra*, 41 Cal.4th at p. 1328.) In any event, the claim fails on the merits.

 "Courts from various jurisdictions have treated 'were they lying' questions differently. One line of cases concludes they are always improper, while another concludes they are never so. (*People v. Foster*[ (2003)] 111 Cal.App.4th [379,] 384 [3 Cal.Rptr.3d 535].) *Zambrano* joins a third line of cases that counsels a trial court to consider these questions in context. ([*People v.*] *Zambrano*[ (2004)] 124 Cal.App.4th [228,] 239 [21 Cal.Rptr.3d

160].)" (*People v. Chatman* (2006) 38 Cal.4th 344, 381–382 [42 Cal.Rptr.3d 621, 133 P.3d 534].) In *Chatman,* we followed the *Zambrano* approach and held that courts should carefully scrutinize " 'were they lying' " questions in context. (*Chatman,* at p. 384.)

"A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken." (*People v. Chatman, supra,* 38 Cal.4th at p. 382.) In asking whether Deputy Fortier lied, the prosecutor sought to clarify defendant's testimony, giving him the opportunity to explain the divergent testimony. Defendant explained that his version was more accurate because he, not Fortier, was the person arrested. Thus, the cross-examination was legitimate inquiry to clarify defendant's position. (*Id.* at p. 383.)

Moreover, the prosecutor's "was he lying" question did not constitute misconduct. " 'Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct.' " (*People v. Chatman, supra,* 38 Cal.4th at pp. 379–380.) Nothing in the record suggests the prosecutor sought to present evidence she knew was inadmissible. (*Id.* at p. 380.) The prosecutor only asked the question once and did not repeatedly ask it to berate defendant or force him to call Deputy Fortier a liar in an attempt to inflame the passions of the jury. (Contrast *People v. Zambrano, supra,* 124 Cal.App.4th at p. 242.) Indeed, defendant refused to call Detective Fortier a liar, saying only that his testimony was incorrect. The prosecutor's sole question was neither deceptive nor reprehensible, and did not constitute misconduct.

Second, defendant asserts that the prosecutor engaged in misconduct by asking argumentative and sarcastic questions. He argues that the sole purpose for the prosecutor's questions was "to put the facts and insinuations of the questions before the jury without seeking new facts." Again, we disagree.

During his confession to Detective Morales, defendant sought to minimize his role in the crimes, claiming he was forced to participate in the robbery by a man he called Charles Williams who was bigger, had a gun, and had just gotten out of prison. Defendant characterized Williams as the mastermind of the crimes, who possessed the only gun used to commit the crimes. According to defendant, Williams ordered the victims to lie on the floor, ordered defendant to tie Kristian up and shoot the victims, and decided what property to take, including the Lexus. During direct examination, defendant reiterated that the other man instigated the robbery, asked him if he wanted to "pull a

lick" (i.e., commit a robbery), and forced him to shoot the victims. Defendant's account differed substantially from the testimony of Kristian, who testified that defendant controlled the situation and did most of the talking.

During cross-examination, the prosecutor questioned defendant about his claim that the other man (whom defendant now referred to as "Lumpy") was the architect of the entire operation. As part of this questioning, the prosecutor asked about Lumpy's request to defendant to commit a "lick." Defendant testified that he asked Lumpy why he was asking him, and that Lumpy replied defendant "looked like [he] was down." Defendant explained Lumpy was "stereotyping me as a type of individual that would do something like that." In response, the prosecutor asked if Lumpy had made an accurate character assessment of him. After the trial court overruled defendant's objection to the question as argumentative, defendant replied, "I can't say I agree, but it was a stereotype." Citing the two prior robberies and the robbery in this case, the prosecutor then asked, "You do commit robberies?" Defendant responded yes, but made the distinction that he took only small items and not valuables, in contrast to Lumpy's request.

When questioned as to whether he tried to leave Lumpy, defendant admitted that he had not tried and explained that he feared Lumpy because he was bigger, had a gun, had just been released from prison, and had "the mentality that he had." When the prosecutor inquired, "and what mentality did he have?" defendant replied, "[to] go and commit a robbery." The prosecutor continued:

"Q. You have gone and committed a robbery, haven't you?

"A. Yes.

"Q. So you have the same mentality as Lumpy, don't you?

"A. No, I do not, no."

The trial court admitted defendant's testimony over defense counsel's objection to the question as argumentative.

 Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it has a tendency in reason to disprove the truthfulness of the witness's testimony. (Evid. Code, § 780; *People v. Humiston* (1993) 20 Cal.App.4th 460, 479 [24 Cal.Rptr.2d 515].) Although a defendant cannot be compelled to be a witness against himself, if he takes the stand and denies the evidence presented against him, the permissible scope of cross-examination is " 'very wide.' " (*People v. Cooper* (1991) 53 Cal.3d 771,

822 [281 Cal.Rptr. 90, 809 P.2d 865].) A defendant cannot, by testifying to a state of things inconsistent with the evidence presented by the prosecution, thereby limit cross-examination to the precise facts concerning which he testifies. (*People v. Cooper, supra,* 53 Cal.3d at p. 822.) Rather, when a defendant testifies, the prosecutor "may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*Ibid.*)

Here, the prosecutor was entitled to impeach defendant's statements—inconsistent with the prosecution's evidence—that Lumpy instigated the robbery and forced him to participate in it. Thus, when defendant suggested that his accomplice had unfairly stereotyped him as being "down" to commit a robbery and that his accomplice had a "mentality" different from his own, the prosecutor was free to confront him with evidence showing the contrary.

Also, contrary to defendant's claim, the prosecutor did not commit misconduct in questioning defendant about the differences between his account of the events at issue and Kristian's. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1025 ["Evidence tending to contradict a witness's testimony is relevant for purposes of impeachment."].) Similarly, there was no impropriety in questioning defendant about whether he knew how young Kristian was when he shot her, as this went to the "circumstances of the crime." (§ 190.3, factor (a).)

Finally, regarding his cross-examination, defendant contends that the prosecutor committed misconduct by improperly suggesting he had fabricated his trial testimony: she asked defendant if he had had a year and a half to think about what happened on the night in question and contrasted his purported inability to remember what Kristian testified to only a few days before with his ability to recollect details about his arrest in 1991. Defendant argues that the prosecutor exacerbated the alleged misconduct by later arguing to the jury that defendant had "proven himself to be a liar and untrustworthy," had "proven himself to be untruthful at best," had "every reason to lie," and "was not to be trusted."

■ A prosecutor's suggestion or insinuation that the defense has been fabricated is misconduct only when there is no evidence to support such a claim. (*People v. Earp* (1999) 20 Cal.4th 826, 862–863 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Here, the prosecutor's questions during cross-examination and comments during argument were based on the inconsistencies between defendant's and Kristian's testimony and the reasonable inferences drawn from that evidence. No misconduct occurred.

## 2. *Admission of 911 Tape As Victim Impact Evidence*

Defendant contends that the trial court erred in admitting Kristian's 911 tape as victim impact evidence during the penalty phase. After defendant shot Kristian and her mother in the head and left the residence, Kristian called 911 for help. Initially, afraid that defendant might still be present, Kristian whispered that two Black males had shot her and her mother in the back of the head. Kristian described the assailants and their clothing, and gave her address. While talking to the dispatcher, her mother's friend, Jerold Smith, arrived at the house and took the telephone from Kristian. Kristian told Smith that someone had shot her and her mother. As Smith spoke with the 911 dispatcher, Kristian went into her mother's bedroom and began screaming when she discovered her injured mother. Kristian's screaming is heard in the background on the tape. Smith urged the dispatcher to send paramedics quickly because Kristian was becoming a "hysterical teenager."

Over defendant's objection, the trial court admitted the 911 tape as relevant victim impact evidence relating to the circumstances of the crime (§ 190.3, factor (a)) and further determined that its probative value outweighed its prejudicial effect (Evid. Code, § 352). The prosecution played the 911 tape for the jury during Kristian's testimony.

At defendant's request, the trial court then admonished the jury as follows, "To the extent that your reaction may be emotional to the 911 tape, you are permitted and it's admissible for your consideration as part of the circumstances of the crime, but I do want to caution you with respect to if you have [an] emotional reaction, that your emotion doesn't wipe out your evaluation of all the evidence. You are to weigh all the factors, including the circumstances of the crime, but emotion doesn't control. You are judges. Your reactions are as human beings. That is why we have human beings sitting on juries instead of computers. But it's not presented in order to have emotion control and weigh out all the other factors presented to you." The prosecution replayed the 911 tape at the end of its rebuttal argument.

Defendant claims that admission of the 911 tape was error because (1) it was nonstatutory aggravating evidence, (2) its prejudicial effect outweighed its probative value (Evid. Code, § 352), and (3) it was so inflammatory that it rendered his trial unreliable and unfair under the Eighth and Fourteenth Amendments. We conclude that the trial court properly admitted the 911 tape as victim impact evidence.

█ " 'In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendment[] to the federal Constitution. [Citation.]' [Citation.]

'The federal Constitution bars victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." [Citation.] State law is consistent with these principles. Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a).' [Citations.]" (*People v. Zamudio, supra*, 43 Cal.4th at p. 364.) Victim impact evidence is admissible under California law provided it "is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353]; see also *People v. Kelly* (2007) 42 Cal.4th 763, 793 [68 Cal.Rptr.3d 531, 171 P.3d 548].)

In *People v. Mitcham* (1992) 1 Cal.4th 1027, 1063 [5 Cal.Rptr.2d 230, 824 P.2d 1277], the defendant shot and killed a jewelry store owner during a robbery and shot an employee, who survived. At the penalty phase of the capital trial, the surviving employee described the psychological and emotional trauma she suffered as a direct result of the defendant's homicidal conduct, as related to the nature and circumstances of the capital offense. We held that the impact of the offense on the surviving victim constituted a circumstance of the crime and was relevant under factor (a) of section 190.3.

Here, the 911 tape clearly showed the immediate impact and harm caused by defendant's criminal conduct toward the surviving victim and was relevant because it " 'could provide legitimate reasons to sway the jury to . . . impose the ultimate sanction.' " (*People v. Edwards* (1991) 54 Cal.3d 787, 836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The 911 tape here was relevant under factor (a) of section 190.3. (*People v. Mitcham, supra*, 1 Cal.4th at p. 1063; see *People v. Roybal* (1998) 19 Cal.4th 481, 515–517 [79 Cal.Rptr.2d 487, 966 P.2d 521] [husband's 911 tape after discovery of wife's body admissible as relevant to guilt phase issues].)

Defendant argues that, because the 911 tape was cumulative of Kristian's testimony at the guilt and penalty phases, the sole purpose of the 911 tape was to inflame the jury. However, the trial court found otherwise. In weighing the probative value and the prejudicial effect, the court agreed with defense counsel that Kristian's "hysteria is clear on the tape." On the other hand, the court determined that the tape showed the impact of the crimes on Kristian that was not evident from the other evidence at trial. The court noted that on the tape Kristian sounded "extremely calm in the beginning," but "allow[ed] herself to let go" and became hysterical only after someone "safe" had entered the house.

The trial court reasoned, "It's not like the defendant is there and she has to keep that lock on her emotions. I think it is relevant to the circumstances of

the crime to the extent that the trial itself reflected that she was the one that kept trying to calm her mother down. I think it is consistent with the attempt on her part to remain calm in spite of what was happening. The trial itself I think was very sanitized and clinical. Her recitation was extremely clinical. And I think for the benefit of [defendant] she did not display any emotion whatsoever. And I think to the extent that the People have a right to show the real horror and the impact on her, they theoretically could have had that presented at the trial itself, and I think they restrained themselves by not. It does show the hysteria. I think the tape does indicate the impact on the victim which is not reflected in the trial itself."

The record supports the trial court's finding that the 911 tape was not cumulative of other evidence. Although Kristian testified about defendant's and his accomplice's commission of the crimes during the guilt phase, and about the longer term impact of those crimes on her during the penalty phase, only the tape conveyed the more immediate impact of the crimes on her. Although the 911 tape "would naturally have tended to arouse emotion and evoke strong feelings of sympathy for [Kristian's] condition, it was not so inflammatory as to have diverted the jury's attention from its proper role or invited an irrational response." (*People v. Mitcham, supra,* 1 Cal.4th at p. 1063; see also *People v. Jurado* (2006) 38 Cal.4th 72, 133–134 [41 Cal.Rptr.3d 319, 131 P.3d 400] [relevant—though emotional—victim impact testimony did not surpass constitutional limits].) Indeed, the trial court admonished the jurors not to let any emotional response subvert their reasoned evaluation of the evidence. Nothing suggests the jury did not follow the court's instruction. Moreover, the jury did not ask to hear the 911 tape during deliberations, suggesting it did not place undue emphasis on it.

Given the relevance of the 911 tape, the trial court did not abuse its broad discretion in concluding the 911 tape was more probative than prejudicial. (*People v. Roybal, supra,* 19 Cal.4th at pp. 515–517 [admission of 911 tape showing husband's distress in finding dead wife's body not an abuse of discretion under Evid. Code, § 352].) Having concluded there was no error and no prejudice, we also reject the claims that admission of the 911 tape deprived defendant of his federal constitutional rights to due process, a fair trial, and a reliable and nonarbitrary penalty determination. (*People v. Boyette, supra,* 29 Cal.4th at p. 445.)

### 3. *Challenges to the Death Penalty Law and Penalty Phase Instructions*

Defendant challenges California's death penalty law and the standard penalty phase instructions for reasons previously rejected by this court in other cases. He raises no basis for reconsideration of these rulings.

Specifically, the death penalty law adequately narrows the class of death-eligible defendants. (*People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) " 'The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination.' " (*People v. Kelly, supra,* 42 Cal.4th at p. 800.) Recent United States Supreme Court decisions do not undermine these conclusions. (*Ibid.*; *People v. Morgan, supra,* 42 Cal.4th at pp. 626–627; *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1068.) "Nor do our jury instructions require jury unanimity on mitigating factors or mislead a jury into believing that such unanimity is required." (*People v. Crew* (2003) 31 Cal.4th 822, 860 [3 Cal.Rptr.3d 733, 74 P.3d 820].) The use of such words in the sentencing factors statute as "extreme" (§ 190.3, factors (d), (g)), "reasonably believed" (§ 190.3, factor (f)), and "impaired" (§ 190.3, factor (h)) is constitutional. (*People v. Kelly, supra,* 42 Cal.4th at p. 801; *People v. Crew, supra,* 31 Cal.4th at p. 860.) Section 190.3, factor (a) is not unconstitutionally overbroad, arbitrary, capricious, or vague. (*People v. Kelly, supra,* 42 Cal.4th at p. 800; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) The "so substantial" standard for comparing mitigating and aggravating circumstances in CALJIC No. 8.88 is not unconstitutionally vague. (*People v. Morgan, supra,* 42 Cal.4th at p. 625.) CALJIC No. 8.88 is not constitutionally defective for not instructing the jury to return a verdict of life imprisonment if aggravating factors do not outweigh mitigating ones. (*People v. Morgan, supra,* 42 Cal.4th at p. 625.) Intercase proportionality review is not constitutionally required. (*People v. Combs, supra,* 34 Cal.4th at p. 868; *People v. Griffin, supra,* 33 Cal.4th at p. 596.) Equal protection principles do not require this court to give capital defendants the same sentence review afforded other felons under the determinate sentencing law. (*People v. Kelly, supra,* 42 Cal.4th at p. 801.) Finally, we reject defendant's claim that a death sentence violates provisions of the International Covenant on Civil and Political Rights, a treaty which the United States ratified in 1992, and violates international norms of human decency reflected in the laws and practices of most civilized nations. (*People v. Morgan, supra,* 42 Cal.4th at pp. 627–628.) "[A] sentence of death that complies with state and federal constitutional and statutory requirements does not violate international law." (*People v. Kelly, supra,* 42 Cal.4th at p. 801.)

## III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 24, 2009.