Filed 4/11/14  P. v. Arciga CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARIO ALEJANDRO ARCIGA,<br><br>        Defendant and Appellant. | F064382<br><br>(Super. Ct. No. F10904281)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

Defendant Mario Alejandro Arciga was convicted of kidnapping and raping a woman.  He also was convicted of attempting to kidnap, and attempting to commit a lewd act against, a 12-year-old girl.  He argues now that the trial court erred when it denied his

motion claiming, pursuant to *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), that the prosecutor exercised peremptory challenges with a discriminatory intent during jury selection. He also argues that the evidence was insufficient to prove that he kidnapped the woman or that he attempted to kidnap the girl. We affirm.

## *FACTS AND PROCEDURAL HISTORY*

M.F. walked along a dirt road beside some railroad tracks in Fresno shortly before noon on August 18, 2010, heading for a bus stop. Arciga drove up to her in a pickup truck. He stopped 10 to 15 feet away and lunged out, hitting her on the head as he did so. He wore a black ski mask with holes for his eyes and mouth. She fell to the ground and screamed. He put his hand over her mouth, saying he would hit her again if she continued screaming. He lifted her shirt and bra and put his mouth on her breast. She asked what he wanted. He wanted sex. He raised her from the ground, took her to the truck, and put her inside. Fearing he would hurt or kill her, she did not try to escape. As M.F. sat on the seat, Arciga pulled her shorts and underwear off, unbuttoned his pants, and pulled out his penis. Then he lay on top of her, pinned her arms to her sides with his, and placed his penis inside her vagina. She freed a hand and tried to remove the ski mask, but he prevented her. When he was finished, he put his penis back in his pants and said "thanks." M.F. put her shorts back on, got out of the truck and walked away. As Arciga drove away, M.F. typed the truck's license plate number into her cell phone. She then walked across a field to a strawberry stand and called 911.

Around 8:00 a.m. the next day, August 19, 2010, 12-year-old C.M. was walking to school. As she approached the school, Arciga drove up in a truck and got out, wearing a black ski mask and holding a gun. He approached within four or five feet and told her to get in the truck. She said no, because she was going to be late for school. Arciga told her to take off her shirt. C.M. said no again. She backed up against the schoolyard fence, afraid Arciga would rape or kill her. He kept repeating his order to get in the truck, with

2.

the gun pointed at her, but she gave him the same answer. After 5 or 10 minutes, Arciga got back in the truck and left. C.M. went to the school entrance and reported the attack to a security guard.

Based on C.M.'s description of the truck, police pulled Arciga over and arrested him the same morning. Inside the cab of the truck were an air pistol and a black ski mask.

For purposes of DNA testing, samples were taken from M.F., Arciga, and a stain on the seat of a pickup truck. M.F. had identified the truck. DNA from sperm cells found in M.F.'s vagina matched Arciga's DNA profile. The truck seat stain contained DNA matching the profiles of both M.F. and Arciga.

The district attorney filed an information charging Arciga with four counts: (1) forcible rape (Pen. Code, § 261, subd. (a)(2));[1] (2) kidnapping to commit rape (§ 209, subd. (b)(1)); (3) attempting to commit a lewd act against a child (§§ 288, subd. (a), 664); and (4) attempting to kidnap a child to commit a lewd act (§§ 209, subd. (b)(1), 664). For count 1, the information alleged the special circumstance that Arciga kidnapped the victim. (§ 667.61, subds. (a), (c)(1), (d)(2).) For counts 3 and 4, the information alleged that Arciga used a deadly weapon. (§ 12022.3, subd. (a).)

At trial, Arciga's defense was that he and M.F. had been dating for two months on August 18, 2010, and that she had consensual sex with him at his house that day. He admitted that he parked his truck near C.M.'s school on August 19, 2010, but denied he confronted C.M. or tried to make her get in the truck. M.F. testified that she had never met Arciga before he raped her.

The jury found Arciga guilty as charged and found the kidnapping and weapon-use allegations true. For count 1, the court imposed a sentence of 25 years to life. For count 4, the court imposed a sentence of 9 years, plus 10 years for the weapon enhancement. Sentences for counts 2 and 3 were imposed and stayed pursuant to

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

section 654.  The total unstayed sentence was an indeterminate term of 25 years to life plus a determinate term of 19 years.

## *DISCUSSION*

### I.      *Wheeler/Batson motion*

Arciga maintains that the trial court erred when it denied his motion under *Wheeler* and *Batson*.  As we will explain, the record supports the trial court's decision.

In 1978, the California Supreme Court held that the California Constitution prohibits the exercise of peremptory challenges on the basis of group bias in a criminal case.  (*Wheeler, supra*, 22 Cal.3d at p. 276.)  "[T]he use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community .…" (*Id.* at pp. 276-277.)  In 1986, the United States Supreme Court similarly held that the equal protection clause of the 14th Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race .…" (*Batson, supra*, 476 U.S. at p. 89.)

A defendant can raise the *Wheeler/Batson* issue by making a motion in the trial court.  To prevail, the defendant must first establish a prima facie case "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson v. California* (2005) 545 U.S. 162, 168 [quoting *Batson*] (*Johnson*).)  It is *not* necessary at this stage for the defendant to show that the peremptory challenges at issue were more likely than not based on a discriminatory purpose.  The defendant's showing need only raise an inference of such a purpose. (*Ibid.*)  Next, the burden shifts to the prosecution to produce race-neutral reasons why jurors have been excluded.  Finally, on the basis of both sides' submissions, the trial court must decide whether purposeful discrimination has been shown.  (*Ibid.*)

In the process of selecting the 12 regular jurors in this case, the court reached the 56th name on the random juror selection sheet.  Of this group, four received hardship deferrals.  Of the remaining 52, 18 had Spanish surnames.  The prosecution exercised 15

peremptory challenges, of which 10 were used to excuse prospective jurors with Spanish surnames. The defense exercised peremptory challenges to excuse four other prospective jurors with Spanish surnames. An additional two were excused for cause. Two remained who were seated on the jury. To summarize, 34.6 percent of the panel from which the jury was selected had Spanish surnames; the prosecution used 66.7 percent of its peremptory challenges to excuse those with Spanish surnames; and 16.7 percent of the jurors that were seated had Spanish surnames.

After jury selection was complete, the court made a record of a *Wheeler/Batson* motion the defense had made during a break. The court denied the motion:

> "We remain on the record. The record should reflect at one of our breaks when I believe when we were going back to challenges for cause, Mr. Criego [defense counsel] raised a Batson-Wheeler motion. He made the motion formally. I will now document that motion. I ruled then, and regardless of whatever point it was in the trial, I believe it was after the exercise of [a peremptory challenge excusing prospective juror number 24]—but it may have been later than that—but whatever stage it was, I considered it to be [an] ongoing motion.
>
> "I'm ruling at this point there has not been a showing of a prima facie case of exclusion. I recognize that of the 15 jurors excused by the defense [*sic*, prosecution], a significant portion bore Hispanic surnames; however, I did my best to keep track and keep notes. Based upon those jurors' answers, it does appear that none—there was not a pattern of discrimination based upon the racial makeup of the jurors standing alone.
>
> "There has been no showing that the People exercised their peremptory challenges in a racially discriminatory manner. I won't even ask the People to make a response, but I have independently based upon my notes, feel and rule that there has been no showing made."

Arciga contends that a prima facie case was established and that the trial court therefore erred in not requiring the prosecution to proffer nondiscriminatory reasons for its peremptory challenges. He asks us either to reverse and remand for a new trial or to reverse and remand with instructions to the trial court to proceed with the next stage of the *Wheeler/Batson* inquiry and order a new trial if appropriate.

5.

In *Johnson, supra,* 545 U.S. at page 169, the United States Supreme Court reiterated the test for a prima facie case established in *Batson*. That test is as follows:

> "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant must first show that he is a member of a cognizable racial group [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." (*Batson, supra*, 476 U.S. at p. 96.)

In this case, it is undisputed that Arciga is a member of a cognizable racial group and that the prosecutor exercised 10 peremptory challenges to excuse potential jurors who belonged to the same group. The only question is whether Arciga showed that, in light of these and the other relevant circumstances, an inference existed that the prosecutor removed those potential jurors on account of their race.

The parties disagree about the standard under which we review a trial court's determination that a defendant has failed to support a *Wheeler/Batson* motion by making a prima facie case of discrimination. Arciga maintains that we are to review this question de novo. The People contend that we should review the record only for substantial evidence supporting the trial court's decision. Both sides cite case law in support of their view. (*People v. Streeter* (2012) 54 Cal.4th 205, 222 [reviewing record independently "to resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race"] (*Streeter*); *People v. Lenix* (2008) 44 Cal.4th 602, 613 ["Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions."].) Our Supreme

6.

Court has, however, recently reaffirmed the following specific description of the review we are to undertake in a case like this one:

> """When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." [Citation]' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 421 (*Pearson*).)

In *Pearson*, a capital case, the court examined the voir dire transcript for the excused prospective juror at issue. It recited several facts about her—that she would find it hard to vote for the death penalty because of her religious beliefs, that she was acquainted with the prosecutor and a defense witness, and other facts—each of which "would provide an adequate reason other than racial discrimination to support the prosecutor's challenge." This analysis demonstrated that the trial court did not err in finding that the defendant failed to present a prima facie case. (*Pearson, supra*, 56 Cal.4th at p. 422.)

We turn, therefore, to the voir dire transcript to seek evidence of grounds upon which the prospective jurors might reasonably have been challenged. The 10 Spanish-surnamed prospective jurors excused by the prosecution were numbers 1, 8, 15, 25, 28, 32, 41, 46, 48, and 56. As will be seen, we hold that there were adequate reasons other than racial discrimination for each challenge.

Prospective Juror No. 1 testified that she had been arrested on a misdemeanor child endangerment charge. She felt the authorities treated her well on that occasion. She was unmarried, unemployed, and a high-school dropout. She spent her spare time with her son and looking for work. The prosecution could reasonably have challenged prospective Juror No. 1 on the basis of these facts. A person with a record of arrest for endangering a child might have a less-protective attitude toward children, such as the child victim in this case, than some other people. A person with a low education level might be regarded as less likely to understand and correctly apply the law.

Prospective Juror No. 8 was a college student, unmarried, and childless. He testified about an encounter he and his father had with two deputy sheriffs after an accident involving a golf cart. One deputy was "really nice," but the other was "just a jerk" and called the father a jackass. Prospective Juror No. 8 said he would be able to put this experience aside and be impartial, yet the experience was "still like in the back of my mind." The prosecutor could reasonably conclude that this juror was more likely than others to mistrust police testimony. The prosecutor also could reasonably factor in the juror's childlessness as possibly making him less sympathetic to the child victim than a parent might be.

Prospective Juror No. 15 was engaged in postgraduate study and was employed in a school district's migrant education program. The prosecutor asked her, "[I]f you saw a rape victim testify and they did not cry on the stand, they did not fall apart on the stand, are you automatically going to say, well, I can't believe anything she says?" The transcript indicates that prospective Juror No. 15's response was a nod. The prosecutor then said, "No? Okay. So how a rape victim reacts is very different." Because the juror's response was ambiguous and the prosecutor's follow up did not yield any clarification, the prosecutor could reasonably be concerned that the juror would be more likely than others to disbelieve an unemotional victim witness. If the juror failed to understand the question, the prosecutor might reasonably have been concerned about the juror's possible lack of attentiveness.

Prospective Juror No. 25 was an accountant. The prosecutor explained that she had a brother who was an accountant, and she had a "concern" that the juror's profession might mean he had a "personality thing" that would demand absolute certainty and prevent him from properly applying the reasonable doubt standard. The juror replied that he did not use the standards applicable to his work in everyday life and would be able to follow the court's instructions. Prospective Juror No. 25 also testified that his father was once arrested for possession of narcotics for sale. The juror believed his father was

8.

treated fairly by the prosecution and the court and adequately represented by defense counsel. The father's case was dismissed. In our view, the prosecutor could reasonably believe, despite the juror's assurance that he did not feel there was any unfairness in his father's case, that the juror might harbor resentment against law enforcement. The prosecutor also could reasonably feel, again in spite of the juror's assurances, that the juror's profession might make him more likely than others to demand greater certainty than the law requires for conviction.

Prospective Juror No. 28 had passed the GED exam and received a high school equivalency credential. He worked at a coffee house and was unmarried and childless. The prosecutor could reasonably take account of his lower education level, particularly in light of the fact that the trial would include scientific testimony regarding DNA evidence. The prosecutor also could take account of the juror's unmarried and childless state, as this could be an indication that the juror might lack understanding of a female witness's potential lack of emotion while testifying.

Prospective Juror No. 32 was a registered nurse employed at a hospital. She raised her hand and told the court, "I don't think I can judge appropriately just because of my personality and I have a hard time judging if I judge correctly or not." Later, when defense counsel asked if anyone believed he or she should not be a juror, prospective Juror No. 32 again raised her hand and said, "Again, real opinion on this case, I just don't feel like I would want to be responsible for judging." Upon further questioning by defense counsel, the juror said she could "be open minded on both sides" but still maintained that "that's going to be difficult for me because I just—my personality—because my personality …." Defense counsel interrupted and asked further questions, after which the juror finally said she could be fair and did not believe she should be excused. The juror had a brother who had been arrested and spent a few days in jail for driving under the influence. She felt he was treated fairly. The prosecutor could reasonably conclude that this juror had no confidence in her ability to reach a verdict in

this case and only said otherwise in the end because of defense counsel's insistent questioning. The prosecutor also could reasonably take account of the juror's experience of a family member being arrested and incarcerated.

Prospective Juror No. 41 had a felony charge pending in Madera County. He felt he was being treated fairly. The prosecutor could reasonably believe the juror's perception of law enforcement and the criminal process could be colored, to the prosecution's detriment, by the juror's own experience of being prosecuted. She also could reasonably believe the juror would be preoccupied during the trial by the question of his own future.

Prospective Juror No. 46 was a special education teacher and was working on a master's degree in special education. She was engaged to be married and was childless. She requested a hardship deferral because her graduate school classes were set to begin on what the court had said would probably, but not necessarily, be the last day of trial. The court denied her request, saying it would excuse her and use an alternate at that time if necessary. The prosecutor could reasonably conclude that this juror might be preoccupied by the possibility that the trial would end up conflicting with the start of classes and might be distracted by the thought that if she were excused at the end of the trial, several days of her time would have been wasted. The prosecutor also could, again, factor in the juror's childlessness.

Prospective Juror No. 48 was married and had children, was unemployed, and "[j]ust barely went to high school." His car was burglarized twice in six months and he was frustrated that the police declined to come investigate. When asked whether, as a result, he would be critical of law enforcement in this case, he said, "I don't think so." The prosecutor could reasonably believe that this juror was more likely than others to be influenced by resentment toward police officers. The prosecutor could, once again, also consider the juror's limited education.

10.

Prospective Juror No. 56 testified that he was not arrested but "detained" in Los Angeles five months earlier. While at an establishment on Sunset Boulevard, he stepped outside for "some fresh air." Some police officers took and searched his wallet and made him get in the back of a police car before releasing him. He said the incident "[l]eft me kind of upset." When asked whether it would affect his ability to be fair and impartial, he said, "I hope not." The prosecutor could reasonably conclude that this juror would be more likely than others to resent and mistrust police officers and therefore would be less likely to believe police testimony.

In light of the foregoing, we hold that the record of voir dire contains grounds upon which the prosecutor could reasonably challenge these 10 prospective jurors.

Arciga cites federal appellate decisions stating that "comparative juror analysis" is appropriate in determining whether a prima facie case was made. (E.g., *Boyd v. Newland* (9th Cir. 2006) 467 F.3d 1139, 1148.) Comparative juror analysis means a comparison of the jurors challenged with those of another race who were not challenged, with the goal of determining whether the prosecutor could really have been concerned with the issues that might have supported the challenges. As Arciga acknowledges, however, our Supreme Court has repeatedly held that comparative juror analysis is not an appropriate part of our review of the prima-facie-case issue. (*Streeter, supra,* 54 Cal.4th at p. 226, fn. 5; *People v. Taylor* (2010) 48 Cal.4th 574, 616-617; *People v. Hawthorne* (2009) 46 Cal.4th 67, 80, fn. 3, overruled on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638.) Consequently, we will not discuss that issue further.

Next, Arciga argues that the trial court erred when it referred to the absence of a "pattern" of racial discrimination in the prosecutor's use of peremptory challenges. This argument is based in part on a misunderstanding of the authority Arciga cites. In one passage in *Johnson*, *supra,* 545 U.S. at page 169, footnote 5, cited by Arciga, the United States Supreme Court reiterated the holding of *Batson* that a prima facie case can be established on the basis of the facts in the defendant's own case, as opposed to a pattern

of prosecutorial action across multiple cases. The trial court here plainly was not referring to that kind of pattern.

It is true, however, that a single instance of a peremptory challenge motivated by a discriminatory intent is unconstitutional; there need not be a pattern consisting of more than one such challenge within a defendant's own case. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478.) Yet we do not think the experienced trial judge who presided in this case believed a small number of racially discriminatory challenges, or a single racially discriminatory challenge, would have been acceptable. The court stated that it had kept track of the individual jurors' answers and in light of those answers found no prima facie case of discrimination. This indicates that the court was monitoring the voir dire of each prospective juror for signs of improper challenges. We conclude that the court did not apply an erroneous standard, despite its use of the word "pattern."

Finally, Arciga asserts that the percentages alone—the prosecutor used 66.7 percent of her peremptories against a group comprising only 34.6 percent of the panel from which the jury was selected—established a prima facie case. There is, however, no rule that a prima facie case is established whenever a given threshold of disparity is crossed. Instead, the rule is that, even if a statistical disparity exists, a ruling of no prima facie case should be affirmed if the "record suggests that the prosecutor had … race neutral reasons" for excusing the jurors. (*Pearson, supra*, 56 Cal.4th at p. 422.) In *Pearson*, the reasons in the record supporting the challenge at issue were sufficient to support the trial court's finding of no prima facie case even though the prosecutor used 50 percent of his peremptory challenges against African-American prospective jurors, where only 12.5 percent of the prospective jurors were African-American. (*Ibid.*) This case is comparable. (See also *Streeter, supra*, 54 Cal.4th at p. 223 [no prima facie case even though prosecutor used 60 percent of peremptories to excuse African-American

prospective jurors who comprised only 28 percent of those called to jury box during voir dire].)**2**

For all these reasons, we conclude that the trial court did not err when it found that Arciga failed to establish a prima facie case in support of his *Wheeler/Batson* motion.

## II.     *Sufficiency of evidence of kidnapping of M.F.*

Arciga maintains that there was insufficient evidence to support the conviction on count 2, kidnapping to commit rape, or the true finding on the kidnapping special circumstance charged in connection with count 1, rape. He says the evidence did not show he kidnapped M.F., since it was undisputed that he only moved her 10 to 15 feet from the dirt road to the cab of the truck. We conclude that this movement was sufficient to support the jury's findings.

> "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is '"whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt."' [Citations.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.

---

**2**At oral argument, during a discussion of the proper method of reviewing a finding of no prima facie case, Arciga's counsel cited *People v. Harris* (2013) 57 Cal.4th 804, 835. *Harris* sets out a nonexclusive list of factors that can be considered in determining whether a prima facie case has been made. These factors include the use of a disproportionate number of peremptory challenges against jurors belonging to the defendant's racial group. Under *Pearson*, however, this factor can be outweighed by evidence in the record of reasonable grounds for each of the peremptory challenges, as we have said.

13.

[Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Proof of the kidnapping circumstance requires a showing that the defendant kidnapped the victim and "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense …." (§ 667.61, subd. (d)(2).) The elements of the kidnapping portion of the offense of kidnapping to commit rape are similar: "[T]he movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).) This provision requires lesser proof than section 667.1, subdivision (d)(2), because it does not call for a *substantial* increase in the risk of harm. Consequently, if the movement did substantially increase the risk of harm to M.F. over the risk inherent in rape and was not merely incidental to the rape, then both the kidnapping circumstance in count 1 and the kidnapping element of the offense in count 2 were established.

Our Supreme Court has held that factors relevant to a substantial increase in the risk of harm include decreased likelihood of detection, danger inherent in a victim's foreseeable efforts to escape, and the defendant's enhanced opportunity to commit additional crimes. (*People v. Vines* (2011) 51 Cal.4th 830, 870.)

The jury could reasonably find that moving M.F. from the road to the truck was not merely incidental to the rape and substantially increased the risk of harm to her. By placing M.F. on her back on the truck's seat and then obstructing the doorway with his body, Arciga reduced the likelihood that the attack would be seen and stopped by passersby, increased the difficulty and danger involved in any possible escape attempt by M.F., and placed M.F. more completely within his control. Arciga greatly enhanced the potential for removing M.F. from the scene and inflicting further harm on her by forcing her into a vehicle. There is no question that a rape victim who has been forced into a

14.

vehicle faces an increased threat to her life and safety beyond that faced by a victim raped outside on the ground.

This conclusion is supported by *People v. Diaz* (2000) 78 Cal.App.4th 243, 248-249. Diaz accosted his victim on a sidewalk in Los Angeles. He forced her to the ground on a grassy area beside the sidewalk and got on top of her. A passerby in a car saw this and said something. Diaz then forced the victim into a park and behind a closed building, where he sexually assaulted her. This was at least 150 feet from the place where he found her. The Court of Appeal held that the jury properly found the movement of the victim into the park and behind the building was not incidental to the assault and substantially increased the risk to the victim. The initial move from the sidewalk to the grass beside it "could easily be characterized as incidental, in that it effected no substantial change in the surroundings .…" (*Id.* at p. 249.) The movement into the park and behind the building, by contrast, "dramatically changed the environmental context." (*Id.* at p. 248.) Further, "the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began." (*Id.* at p. 249.) Here, similarly, an attack beside the road might not have supported the kidnapping aspects of the verdict, but the movement into the truck was a significant, nonincidental change in surroundings that made the situation substantially more dangerous for M.F.

### III. *Sufficiency of evidence of attempted kidnapping of C.M.*

Arciga makes a similar argument about the kidnapping component of count 4, attempting to kidnap a child to commit a lewd act. Here, the propriety of the verdict is even more straightforward.

To prove an attempt, the prosecution must show a specific intent to commit the target crime and a direct but ineffectual act done toward its commission. (*People v. Swain* (1996) 12 Cal.4th 593, 604.) A conviction of attempted kidnapping to commit a lewd act therefore requires an intent to commit a lewd act, an intent to cause a "movement

15.

of the victim … beyond that merely incidental to the commission of, and increas[ing] the risk of harm to the victim over and above that necessarily present in" (§ 209, subd. (b)(2)) the lewd act, and a direct, ineffectual act toward commission.

Arciga pointed a weapon at C.M. and ordered her to raise her shirt and get in his truck. From this, the jury could readily infer an intent to drive her away from her school and assault her. Driving her away in the truck certainly would increase the risk to her, even more than did the forcing of M.F. into the truck. The order given at gunpoint was a direct but ineffectual act toward the commission of the crime. The guilty verdict on count 4 was well supported.

### *DISPOSITION*

The judgment is affirmed.

_____
LaPorte, J.[*]

WE CONCUR:


_____
Poochigian, Acting P.J.


_____
Franson, J.

_____

[*]Judge of the Superior Court of Kings County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.