Filed 12/11/20 P. v. Birdine CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B298724 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA087169) |
| v. | |
| KENNY BIRDINE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Daniel B. Feldstern, Judge. Affirmed.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kenny Birdine appeals the judgment entered following a jury trial in which he was convicted of first degree premeditated murder.  (Pen. Code,[1] § 187, subd. (a).)  The jury found that appellant personally discharged a firearm causing death (§ 12022.53, subd. (d)) and that the crime was gang-related (§ 186.22, subd. (b)(1)(C)).[2]  The trial court sentenced appellant to 50 years to life in state prison.

Appellant contends the trial court's prejudicial error in admitting evidence that appellant was arrested in possession of a gun unrelated to the shooting requires reversal.  We disagree and affirm.

## FACTUAL BACKGROUND

On August 20, 2016, appellant fatally shot Justin Lishey, a rapper known as Kid Cali, at a party held on the grounds of a large house in Granada Hills.  The event had been advertised on social media and was attended by two to three hundred people.  It started at 2:00 p.m., and was scheduled to end at 8:00 p.m.  The house was equipped with numerous exterior surveillance cameras at the gates and throughout the grounds, which recorded the entire party including the arrival and departure of the guests and the shooting of Lishey.

Appellant arrived at the party around 7:40 p.m.  Security searched many of the guests before admitting them inside, and appellant was among those patted down as he entered.

Another party guest, Steven Abramovich, arrived around 7:00 p.m.  After walking around and listening to the music for a

---

[1] Undesignated statutory references are to the Penal Code.

[2] Two counts of attempted murder charged in the amended information were dismissed prior to the start of trial.

while, Abramovich got a drink and sat down on a retaining wall near the basketball court.  Sometime after 8:00 p.m., about five or ten minutes after he had sat down, Abramovich saw a slim Black male, later identified as appellant, emerge from the crowd and yell something at Lishey as he approached.  Lishey, who was standing with a small group of people in a circle at the edge of the basketball court with his back to appellant, turned toward the sound.  Appellant removed a gun from his waistband and fired directly at Lishey, aiming at his chest.  As Lishey fell backward to the ground, appellant fired four more times, advancing toward Lishey until he was standing directly over him.  The party erupted in chaos, and appellant ran into the crowd as the guests rushed to the exits.  A few people remained with Lishey as Abramovich called 911.  Before the shooting, Abramovich had not observed any fighting or arguments nor had he seen Lishey behave aggressively toward anyone.  Investigators found no evidence to indicate Lishey had a gun.

Lishey suffered four gunshot wounds, one of which was fatal.  He died shortly after the shooting.  Five expended nine-millimeter shell casings were recovered from the scene and determined to have been fired from the same firearm.

At the time of the shooting, appellant was a 19-year-old "young gangster" (YG) in the 92nd Street clique of the Inglewood Family Bloods (IFB) gang, with the moniker Rampage or Lil' Rampage.  He had "Family First" tattooed prominently across his chest, which signified both his membership in the gang and that he had committed one or more crimes on the gang's behalf.  Appellant also admitted his IFB membership on numerous occasions going back to 2014, and he regularly associated with

3

other IFB gang members, posing in numerous pictures with them throwing gang signs with his hands.

One of appellant's best friends, Kamal Key, with whom appellant was seen on video entering the party before the shooting, was also an IFB member featured in many of the photos with other gang members. Akeem "2Much" Foreman, a senior "original gangster" (OG) member of IFB arrived at the party after appellant and provided appellant with the gun he used to shoot Lishey. Several other IFB gang members, including a prominent rapper, also attended the party. In the moments before the shooting, the surveillance video showed appellant and Foreman standing together on the basketball court. As appellant began to make his way over to Lishey, the group around them disbursed in the opposite direction and Foreman walked away from appellant while looking over his shoulder. After the shooting, the surveillance video showed appellant and Foreman meet on the street in front of the house where appellant returned the murder weapon to Foreman.

According to the prosecution's gang expert, as an OG in the IFB, Foreman was an older senior member in the gang's hierarchy who had the authority to give orders to junior gang members, or YG's, such as appellant. Because most individuals joined the gang in ninth grade, by the age of 19 a YG would be a well-established member of the gang. The gang expert further explained that only a trusted junior gang member would be permitted to socialize with an OG at a party, and a junior member would not be tasked with a shooting unless the OG were confident the junior member would carry it out. According to the expert, guns are important tools for the gang, but difficult to come by. As a result, when a firearm is acquired by the gang, it

4

is released only to the most respected and trusted individuals who will use it as directed by an OG.

One of the major rivals of the IFB is the Neighborhood Crips, consisting of multiple cliques including the Rollin' 90s or the 9-0 Neighborhood Crips. These Blood and Crips gangs have committed many violent crimes against one another, including murder. According to the gang expert, shooting a rival gang member is the ultimate act of loyalty to the gang, earning the greatest respect within the gang. Appellant's own father had been a gang member who was killed in gang violence, and in his contacts with police prior to the shooting, appellant often expressed a hatred for the Neighborhood Crips. After the shooting, appellant got several new prominent IFB tattoos, including one that specifically referred to his hatred of the Rollin' Neighborhood Crips gangs.

Following his arrest, appellant was interviewed by Los Angeles police detectives on September 12, 2016, and a video recording of the interview was played at trial.

Much of what appellant initially told the detectives was directly contradicted by the surveillance video, and after being confronted with portions of the video, appellant ultimately admitted his role in the shooting. At some point during the party, Lishey walked over to Foreman and identified himself as a 9-0 Crip. Foreman responded, " 'No. I'm not shaking your hand; . . . I'm from Inglewood Family,' " and " 'I kill y'all niggas.' " A "big argument" ensued, which was broken up, but later "they got into it" again.

After seeing a portion of the surveillance video that showed him with a gun in his hand, appellant claimed someone had handed him a nine-millimeter gun only after the shooting. One

of the detectives asked whether appellant had been scared that night.  Appellant responded that he had been afraid of Foreman, who "talked me up to that shit.  And I was drunk, you feel me?"

Appellant then explained that toward the end of the party, Foreman handed him a gun and told him that Lishey and his cohort were going to start shooting them at the end of the party. Everything was suddenly happening fast, and when Lishey's group started to approach, appellant "just shot in the crowd."  At first he insisted he fired only two or three times, and was not aiming at anyone in particular.  After the shooting, appellant returned the gun to Foreman.

Estimating the number of Crips at the party at 30, significantly outnumbering the Bloods, appellant said he had been nervous about the Crips from the moment he arrived.  There had been "banging" "along with tension, arguing and drinking," but appellant was just drinking and having fun with the people in his own group.  Appellant insisted that he never intended to shoot anyone, much less kill a person, even as he admitted firing four or five times at Lishey as Lishey was backing away.  He asserted, "that's not the type of person I am.  I think it was just, feel me,  heat of the moment, and then, niggas handing me guns and alcohol and shit."

Appellant maintained that when Foreman handed him the gun, he thought he was simply holding it for Foreman; it did not even occur to him he would use it to shoot someone.  But appellant also claimed that Foreman "forced [him] to bust on that nigga," and "he kept it in [appellant's] head the whole party" that they were "about to get shot at, at the end of the party." Appellant said that when Foreman gave him the gun about five minutes before the shooting, he put it on his hip.  After waiting a

6

few minutes, Foreman said, " 'Just bust, bust, bust,' " and appellant started shooting. Appellant never looked to see whether Lishey had a gun.

Three weeks later, appellant was arrested in possession of a nine-millimeter gun. Appellant insisted that the gun in his possession at his arrest was not the murder weapon. Although both guns belonged to Foreman, Foreman had left the murder weapon with someone else before flying to Arizona. Appellant told the detectives he could get the gun by simply calling Foreman and telling him, "hey, I need that nine." As for the other gun, appellant claimed that Foreman had given it to Key, and it was in Key's backpack in the car.

## DISCUSSION

### The Trial Court Did Not Abuse Its Discretion in Admitting Evidence that Appellant Had a Gun in His Possession When He Was Arrested a Few Weeks After the Shooting

#### A. *Relevant background*

The prosecution presented evidence that at the time of his arrest on September 10, 2016, appellant possessed a nine-millimeter semiautomatic handgun with a 30-round clip of ammunition. Although ballistics tests to determine whether it was the same weapon used to kill Lishey were inconclusive, the prosecution sought to admit the evidence that appellant was with gang members and possessed a loaded gun to counter appellant's statements that he had been manipulated into committing the shooting and had been afraid for his life. Appellant objected to admission of the evidence on relevance grounds as well as under Evidence Code sections 1101 and 352.

7

Over appellant's objections the trial court ruled the evidence admissible. Specifically, the court determined the evidence that appellant possessed a nine-millimeter gun three weeks after the shooting was relevant to impeach appellant's statements minimizing his culpability with respect to possession of the murder weapon and his state of mind in shooting Lishey. Finding the evidence of appellant's subsequent gun possession was not inflammatory, the court concluded that any potential for prejudice was substantially outweighed by the relevance and probative value of the evidence. The court also overruled appellant's objection to the admission of appellant's statements to the detectives during his interview regarding the firearm in his possession at his arrest.

The trial court instructed the jury that evidence appellant possessed a gun at the time of his arrest could not be considered as evidence of bad character, but could be considered in determining the issues of intent to kill, premeditation, credibility, and whether the shooting was gang-related.

**B. *The trial court did not abuse its discretion in admitting the gun evidence on the basis of its finding that the evidence was probative and relevant to issues other than a propensity to possess and use guns***

Appellant contends the evidence of his possession of a gun at the time of his arrest should have been excluded because it was probative only as inadmissible propensity evidence and otherwise irrelevant to any disputed issue before the jury. We disagree.

Evidence Code section 1101, subdivision (a) " 'expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to

8

commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406 (*Bryant*).) Although evidence of the defendant's commission of other crimes, civil wrongs or bad acts is inadmissible to prove the defendant's conduct on a specified occasion, such evidence can be used to attack the defendant's credibility. (Evid. Code, § 1101, subd. (c); *People v. Kennedy* (2005) 36 Cal.4th 595, 620 [limitations on the admissibility of evidence of specific instances of misconduct "do not apply to evidence offered to support or attack the credibility of a witness"]; *People v. Hawthorne* (2009) 46 Cal.4th 67, 99 ["Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it has a tendency in reason to disprove the truthfulness of the witness's testimony"].) Such evidence may also be admitted to prove a material fact in dispute such as motive, intent, preparation, plan, knowledge, or the absence of mistake or accident. (Evid. Code, § 1101, subd. (b); *People v. Cage* (2015) 62 Cal.4th 256, 273 (*Cage*); *People v. Jones* (2013) 57 Cal.4th 899, 930.)

" 'Evidence Code section 210 defines "relevant evidence" as "evidence . . . having any tendency in reason to prove or disprove any disputed fact *that is of consequence to the determination of the action*." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 438 (*Pearson*).) If evidence of another instance of defendant's misconduct is relevant to prove some fact other than propensity, the evidence may properly be admitted subject to a limiting instruction upon request. (*Bryant*, *supra*, 60 Cal.4th at p. 406.) We review the trial court's ruling on the admissibility of such evidence for abuse of discretion (*Cage*, *supra*, 62 Cal.4th at

9

p. 274; *Bryant*, at p. 405), reversing only where " 'it is shown
" 'the trial court exercised its discretion in an arbitrary,
capricious, or patently absurd manner that resulted in a manifest
miscarriage of justice.' " ' " (*People v. Jones* (2017) 3 Cal.5th 583,
609, quoting *People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Here, the evidence that appellant possessed a firearm at
his arrest within three weeks of the homicide was relevant to
proving several disputed issues of fact other than appellant's
disposition to possess and use guns.

First, the gun possession evidence was relevant to proving
the gang enhancement under section 186.22, subdivision (b)(1).
To establish that enhancement, the prosecution was required to
prove the killing of Lishey was "gang-related," that is, it was
"(1) 'committed for the benefit of, at the direction of, or in
association with any criminal street gang,' and (2) 'with the
specific intent to promote, further, or assist in any criminal
conduct by gang members.' " (*People v. Rivera* (2019) 7 Cal.5th
306, 331; *People v. Livingston* (2012) 53 Cal.4th 1145, 1170–
1171.) According to one of the defense theories the shooting was
not gang-related but was the culmination of a dispute over a
woman between Foreman and Lishey. The evidence that at the
time of his arrest three weeks after the killing appellant was with
an IFB member while armed with another nine-millimeter gun
belonging to Foreman tended to rebut this defense theory by
showing appellant's ongoing support of the gang and his
relationship with one of its leaders. Moreover, appellant's claims
that he knew the firearm in his possession at his arrest was a
*different* nine-millimeter gun than the one used in the shooting,
that he knew Foreman had entrusted that other nine-millimeter
gun to Key, and that he knew Foreman's whereabouts, the

10

probable location of the murder weapon, and could call Foreman to get the gun for police underscore the relevance of the gun evidence to the gang enhancement issue.  As the prosecutor argued, appellant's continued involvement with Foreman after the shooting and possession of his gun tended to show the shooting had been part and parcel of appellant's gang involvement, and a way for appellant to demonstrate his fealty and commitment to strengthening the gang.

The gun evidence was also relevant to establish appellant's intent to kill Lishey as well as to impeach appellant's credibility with respect to his exculpatory statements about carrying out the shooting.  The primary theory of the defense was that, having been manipulated by Foreman, appellant acted in unreasonable self-defense when he fired at Lishey, genuinely believing his life was in imminent danger.  During his recorded interview with police, appellant also made numerous exculpatory statements in an attempt to minimize his own responsibility for the killing.  Appellant repeatedly insisted that he never intended to shoot or hurt anyone, much less kill Lishey, whom he did not even know.  But the fact that appellant had a loaded gun in his possession just three weeks after killing Lishey directly undermined appellant's credibility in making those assertions.

Of course, " '[e]vidence is relevant when no matter how weak it is it tends to prove a disputed issue.' " (*Pearson*, *supra*, 56 Cal.4th at p. 438.)  The gun evidence presented here was certainly not dispositive on the issues of "gang-relatedness," intent to kill, or appellant's credibility.  It did, however, have some tendency in reason to prove or disprove disputed facts related to those issues, and was thus relevant.  (*Pearson*, at p. 438.)  The trial court did not abuse its discretion in admitting

11

the evidence of appellant's possession of a firearm at the time of his arrest.

**C.** ***The trial court properly determined that the gun evidence was not inflammatory, nor was its presentation confusing or lengthy, and its probative value outweighed any possible prejudice***

Even if uncharged acts evidence is relevant and otherwise admissible, such evidence may nevertheless be excluded under Evidence Code section 352 if its probative value is substantially outweighed by the probability that its admission will require an undue consumption of time, will confuse or mislead the jury, or it is unduly inflammatory or poses a substantial risk of undue prejudice. (*Bryant*, *supra*, 60 Cal.4th at p. 407; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1076.) The trial court in this case did not abuse its discretion in determining that the gun evidence was admissible under Evidence Code section 352.

Presentation of the evidence that appellant possessed a loaded gun at the time of his arrest took very little time: The testimony of the arresting officer was reported in six pages of transcript, only two of which concerned the firearm. There was also nothing confusing about the officer's straightforward account. He merely testified that, after seeing appellant in the front passenger seat of the car reach into his waistband and rummage in the backpack at his feet, the officer recovered a nine-millimeter gun and 30 rounds of ammunition from the backpack. And the evidence was not inflammatory. Given the gang evidence and appellant's own account of the murder—he shot a complete stranger to death at a party while the man was backing away, without even bothering to check if the victim was armed—there was no substantial likelihood the jury would have

12

been inflamed upon hearing appellant had a gun a few weeks after the shooting.

Admission of the gun evidence simply did not create a substantial danger of undue prejudice.  (Evid. Code, § 352, subd. (b).)  As our Supreme Court has repeatedly explained, " ' "In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.]  ' " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.' " ' [Citation.]  The 'prejudice' which section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' " (*Cage, supra*, 62 Cal.4th at p. 275; *People v. Williams* (2013) 58 Cal.4th 197, 270.)

Appellant contends that the gun evidence "was likely to evoke an emotional bias, as it suggested appellant was a violent person who possessed a loaded deadly weapon and reached for the weapon as the police approached."[3]  But as set forth above, the gun evidence was relevant to several disputed issues of fact, including the elements of the gang enhancement, appellant's intent to kill, and his credibility in explaining the mitigating circumstances of the shooting in his interview with police, while its probative value as propensity evidence was de minimus. Indeed, in the face of abundant evidence of appellant's immersion in the gang lifestyle, his awareness of the deadly risks faced by gang members, the loss of his own father to gang violence, and

---

[3] The clear implication of the officer's testimony is that appellant sought to hide the weapon and distance himself from it as the officer drew near to the car, not that he appeared ready to use it as the officer approached.

13

the new prominent gang tattoos he got *after* the shooting, it is virtually inconceivable that evidence of appellant's possession of a gun three weeks after the killing would unduly prejudice him in the eyes of the jury.

Finally, we note that the jury was given a limiting instruction that appellant's possession of a gun when he was arrested could not be considered as evidence of bad character, but could only be considered in determining the issues of intent to kill, premeditation, credibility, and whether the shooting was gang-related. In the absence of any indication to the contrary, we presume the jury followed the court's instruction. (See *Cage, supra*, 62 Cal.4th at p. 275.)

In sum, we find no abuse of discretion in the trial court's admission of the challenged gun evidence under Evidence Code section 1101 or section 352. For the same reasons, we reject appellant's federal constitutional claim that admission of the evidence violated his due process rights. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1116 [a defendant's constitutional rights not impinged by the routine application of state evidentiary law].) Having determined the evidence was relevant and properly admitted to prove a fact of consequence, we find no violation of appellant's federal constitutional rights. (*People v. Foster* (2010) 50 Cal.4th 1301, 1335; *People v. Benavides* (2005) 35 Cal.4th 69, 96 [federal constitutional claim fails where the evidence was properly admitted under state law].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.

15